**UNITED STATES of America, Appellant**

v.

**Patrick William SWINT.**

No. 93–7316.

United States Court of Appeals,
Third Circuit.

Argued Dec. 17, 1993.

Decided Jan. 14, 1994.

William A. Behe (argued), Asst. U.S. Atty., Wayne P. Samuelson, U.S. Atty., Harrisburg, PA, for appellant.

Allan J. Sagot (argued), Allan J. Sagot & Associates, Philadelphia, PA, for appellee.

Before: GREENBERG and ROTH, Circuit Judges, and FULLAM, District Judge *.

## OPINION OF THE COURT

GREENBERG, Circuit Judge.

### I.  FACTUAL AND PROCEDURAL BACKGROUND

The United States appeals from an order of April 28, 1993, insofar as it suppressed statements given by the appellee Patrick William Swint to federal agents on May 2, 1991.[1]  The background of the case is as follows.  Pennsylvania authorities arrested Swint on November 1, 1990, on state drug charges.  Subsequently, a state court re-

leased Swint on bail.  Thereafter, Swint and his attorney discussed with the state authorities, particularly Kevin Kelly, a Delaware County deputy district attorney, the possibility that Swint would cooperate with them.  As of April 1991, however, Swint had provided little, if any, assistance.  Moreover, on March 11, 1991, agents of the Drug Enforcement Administration had observed Swint accepting precursor chemicals used to manufacture methamphetamine.  As a result of this observation, Special Agent Keith Miller of the DEA asked Kelly to arrange a meeting with Swint.  Kelly telephoned Swint's attorney, Michael Dignazio, to arrange a discussion about possible cooperation and a plea agreement and Kelly and Dignazio scheduled a meeting for May 2, 1991.  Kelly, however, did not tell Dignazio or Swint that the DEA would be represented at the meeting or that there would be a discussion regarding possible federal charges.

On May 2, 1991, Dignazio's associate, Douglas Smith, accompanied Swint to the meeting at the offices of the Criminal Investigation Division of the Delaware County District Attorney's Office at the Delaware County Courthouse.  All original parties to this meeting, namely Kelly, Smith, and Swint, as well as Dignazio who did not attend, understood that the meeting was to be for Swint to make an off-the-record proffer regarding the cooperation he could provide in exchange for a negotiated plea on the outstanding state charges against him.  Such off-the-record meetings are customary in Delaware County.

During the first stage of the meeting, Swint, Smith, Kelly, and other state and local law enforcement officers briefly discussed Swint's post-arrest conduct.  After Swint denied having been involved in post-arrest drug activity, Kelly left the room and returned with federal agents, including Miller, and the meeting entered a second stage.

During this second stage, the federal agents confronted Swint with evidence of his post-arrest drug activity.  They advised Swint that it was likely federal authorities

---

* Honorable John P. Fullam, Senior United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

1.  The order and the accompanying opinion also dealt with matters not involved in this appeal.

would arrest him at some point, that he faced serious federal charges, and that he should cooperate with the federal investigation. Specifically, Miller told Swint that he had a warrant for Swint's arrest on federal drug charges which carried a ten-year mandatory sentence, and that he could arrest Swint with the warrant. Moreover, Kelly testified that he may have mentioned that Miller might take Swint into custody and that Swint's bail might be revoked based on the DEA's evidence of his post-arrest criminal conduct. After being confronted with the evidence supporting federal charges against him and advised to cooperate, Swint consulted privately with Smith. He then agreed to make a statement and to cooperate with the federal agents. Believing that his "job was finished," Smith left the District Attorney's office, as he did not want to get involved in Swint's actual cooperation.

During the third stage of the meeting, the DEA agents questioned Swint who was then without counsel.[2] At that time, Swint made the inculpatory statements involved on this appeal. The government concedes that no person on May 2, 1991, at the offices of the District Attorney gave Swint warnings in conformity with *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).[3]

On November 3, 1992, a federal grand jury returned an indictment against Swint for conspiracy to manufacture, distribute and possess with intent to manufacture and distribute methamphetamine and P2P. Swint pleaded not guilty, and on January 4, 1993, he filed a motion to suppress the statements he made to the DEA agents on May 2, 1991. The district court conducted a hearing on the motion, and later held in a memorandum opinion that the statements were inadmissible. *United States v. Swint,* Crim. No. 92–286–02, at 20–21 (M.D.Pa. Apr. 28, 1993) (*see* App. at 204–05). The United States has

appealed from the order entered on April 28, 1993, on this opinion. We have jurisdiction under 18 U.S.C. § 3731.

## II. DISCUSSION

■ The district court primarily predicated its opinion that Swint's statements were inadmissible on its conclusion that the government had secured them from Swint when he was in custody without giving him the *Miranda* warnings. *See Illinois v. Perkins,* 496 U.S. 292, 296–98, 110 S.Ct. 2394, 2397, 110 L.Ed.2d 243 (1990). However, the court also held that "Swint's statements are . . . inadmissible because they were involuntary." *United States v. Swint,* Crim. No. 92–286–02, at 20–21 n. 8 (*see* App. at 204–05). We will affirm the district court's order on the latter ground, as we hold that Swint's statements to the DEA agents on May 2, 1991, were involuntary. Consequently, we do not decide whether the district court erred in holding that Swint's interrogation was custodial and thus that his statements also were inadmissible due to the government's failure to give him *Miranda* warnings.

■ Our review of the district court's holding that Swint's statements were involuntary is plenary, but we accept its findings of fact unless they are clearly erroneous. *Arizona v. Fulminante,* 499 U.S. 279, 317, 111 S.Ct. 1246, 1252, 113 L.Ed.2d 302 (1991) (citing *Miller v. Fenton,* 474 U.S. 104, 110, 106 S.Ct. 445, 449, 88 L.Ed.2d 405 (1978)). *See also Beckwith v. United States,* 425 U.S. 341, 348, 96 S.Ct. 1612, 1617, 48 L.Ed.2d 1 (1976) (appellate court has duty " 'to examine the entire record and make an independent determination of the ultimate issue of voluntariness' ") (quoting *Davis v. North Carolina,* 384 U.S. 737, 741–42, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895 (1966)).

■ It is clear that "only voluntary confessions may be admitted at the trial of guilt

---

**2.** Although the government contends that Smith was present during Swint's questioning by the DEA agents, the district court credited Smith's testimony that he was not present during the questioning. *United States v. Swint,* Crim. No. 92–286–02, at 14 & n. 4 (M.D.Pa. Apr. 28, 1993) (*see* App. at 198). Under our standard of review, we accept this finding.

**3.** Before leaving the meeting, the federal agents outfitted Swint with a transmitter to be worn at his meeting with a codefendant that evening. Several days later Swint terminated his cooperation with the federal agents.

or innocence," *Lego v. Twomey*, 404 U.S. 477, 478, 92 S.Ct. 619, 621 (1972), and the government does not challenge the applicability of this principle to the statements involved here. Rather, it contends that the statements were voluntary. The Supreme Court has recognized that noncustodial interrogations may "by virtue of some special circumstances, be characterized as [involuntary]." *Beckwith*, 425 U.S. at 347–48, 96 S.Ct. at 1617. Thus, in this case, even if. Swint's interrogation had been noncustodial, the government had the burden of "proving, by a preponderance of the evidence, that [Swint's] ... confession was voluntarily given." *United States ex rel. Hayward v. Johnson*, 508 F.2d 322, 326 (3d Cir.) (citing *Lego v. Twomey*, 404 U.S. at 487–89, 92 S.Ct. at 627), *cert. denied*, 422 U.S. 1011, 95 S.Ct. 2637, 45 L.Ed.2d 675 (1975).

■ "The Self–Incrimination Clause of the Fifth Amendment guarantees that no person 'shall be compelled in any criminal case to be a witness against himself.'" *Withrow v. Williams*, — U.S. —, 113 S.Ct. 1745, 1751, 123 L.Ed.2d 407 (1993). However, prior to the Supreme Court holding that the Fifth Amendment applied to the states, it held that the Due Process Clause of the Fourteenth Amendment bars the admission of "involuntary" confessions. *See Colorado v. Connelly*, 479 U.S. 157, 163, 107 S.Ct. 515, 519 (1986). "The Court has retained this due process focus, even after holding, in *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), that the Fifth Amendment privilege against compulsory self-incrimination applies to the States." *Colorado v. Connelly*, 479 U.S. at 163, 107 S.Ct. at 519–20 (citing *Miller v. Fenton*, 474 U.S. at 109–10, 106 S.Ct. at 449). Thus, the Fourteenth Amendment due process cases provide the clearest definition of "voluntariness." *See Schneckloth v. Bustamonte*, 412 U.S. 218, 223, 93 S.Ct. 2041, 2045–46 (1973) ("The most extensive judicial exposition of the meaning of 'voluntariness' has been developed in those cases in which the Court has had to determine the 'voluntariness' of a defendant's confession for purposes of the Fourteenth Amendment.").

"In determining whether a confession was voluntary, we must satisfy ourselves that the confession was 'the product of an essentially free and unconstrained choice by its maker,' that it was 'the product of a rational intellect and a free will' and that the appellant's will was not 'overborne.'" *United States ex rel. Hayward v. Johnson*, 508 F.2d at 326 (citations omitted).

[C]ourts look to the totality of circumstances to determine whether a confession was voluntary. Those potential circumstances include not only the crucial element of police coercion, *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 521, 93 L.Ed.2d 473 (1986); the length of the interrogation, *Ashcraft v. Tennessee*, 322 U.S. 143, 153–54, 64 S.Ct. 921, 925–26, 88 L.Ed. 1192 (1944); its location, *see Reck v. Pate*, 367 U.S. 433, 441, 81 S.Ct. 1541, 1546 [6 L.Ed.2d 948] (1961); its continuity, *Leyra v. Denno*, 347 U.S. 556, 561, 74 S.Ct. 716, 719, 98 L.Ed. 948 (1954); the defendant's maturity, *Haley v. Ohio*, 332 U.S. 596, 599–601, 68 S.Ct. 302, 303–05, 92 L.Ed. 224 (1948) (opinion of Douglas, J.); education, *Clewis v. Texas*, 386 U.S. 707, 712, 87 S.Ct. 1338, 1341, 18 L.Ed.2d 423 (1967); physical condition, *Greenwald v. Wisconsin*, 390 U.S. 519, 520–21, 88 S.Ct. 1152, 1153–54, 20 L.Ed.2d 77 (1968) (per curiam); and mental health, *Fikes v. Alabama*, 352 U.S. 191, 196, 77 S.Ct. 281, 284, 1 L.Ed.2d 246 (1957). They also include the failure of police to advise the defendant of his rights to remain silent and to have counsel present during custodial interrogation. *Haynes v. Washington*, 373 U.S. 503, 516–17, 83 S.Ct. 1336, 1344–45, 10 L.Ed.2d 513 (1963) [other citations omitted].

*Withrow*, — U.S. —, 113 S.Ct. at 1754.

■ Unless there is "police conduct causally related to the confession," a confession is considered voluntary. *Colorado v. Connelly*, 479 U.S. at 164, 107 S.Ct. at 520. Thus, a court will not hold that a confession was involuntary unless it finds that it was the product of "police overreaching." *Id.*, 107 S.Ct. at 520. In this case, the district court concluded that there was governmental "overreaching" because "the Government's

lack of candor led to substantial confusion regarding the implications of [Swint's] decision to cooperate and make a statement to federal authorities," and Swint's "will was overborne to the extent that he made a statement that he would not have made had it not been for the misleading actions of the Government." *United States v. Swint*, Crim. No. 92–00286–02, at 20–21 n. 8 (*see* App. at 204–05).

Thus, the district court's holding rests on its findings that neither Swint nor his attorney knew that Swint's statements could be used against him and that their "confusion [regarding the implications of Swint's statements] ... was largely the result of a situation of the Government's making." *Id.* at 16–17 (*see* App. at 200–01). The district court based these findings on five factors: (1) Swint, Kelly, and Swint's attorneys (Smith and Dignazio) understood that the May 2, 1991 meeting at the District Attorney's office "was to be an informal, off-the-record proffer by Mr. Swint regarding the potential assistance he could provide to state authorities in return for a negotiated plea to the outstanding state charges against him"; (2) it was common practice for Delaware County authorities "to hold such informal, off-the-record meetings with defendants seeking to cooperate in return for a plea agreement"; (3) "neither Mr. Swint nor Swint's attorney's were informed beforehand that any federal agents would be at the meeting nor that any federal charges or other issues not covered by the proffer agreement would be discussed"; (4) "the temporal proximity between the discussion of state and federal charges with Swint was wholly of the Government's making"; and (5) neither the state nor federal agents clearly informed Swint or his attorney that Swint's statements to the DEA agents would not be off-the-record. *Id.* at 17–20 (*see* App. at 201–04).[4]

We agree that considered together the foregoing factors indicate that Swint's state-

ments on May 2, 1991, were involuntary. Furthermore, additional factors support that conclusion: Swint was not given *Miranda* warnings; Swint's attorney was not present when the statements were made;[5] the statements were made in the District Attorney's office in the courthouse; and the officers present were armed with their weapons clearly visible. *Id.* at 14 (*see* App. at 198). Thus, exercising plenary review, we hold that Swint's statements on May 2, 1991, were involuntary.

In reaching our result, we have not overlooked the government's argument that "the district court's holding instantly expands the definition of coercion" because there is a "tremendous difference" between a statement that is coerced and a statement which is merely the product of confusion. Govt.Br. at 41–42. Rather, we conclude that whatever might be true in other cases, in the circumstances here, there was much more involved than confusion. In this case, the government's misleading conduct was coercive, and this coercive conduct caused Swint's confusion, depriving him of the ability to make a free and unconstrained choice about whether to make a statement to the federal agents. At the DEA's request, the state authorities drew Swint into the District Attorney's office on the assumption he would be making only off-the-record statements regarding pending state charges. Once Swint arrived at the office and Kelly engaged him in a dialogue, the DEA agents joined the meeting, confronted Swint with evidence supporting federal charges against him, and urged him to cooperate with them. Moreover, Kelly admitted that he "touched upon the criminal activity revealed by [the DEA's] ... investigation as a basis for revocation of bail," *id.* at 14 (*see* App. at 198), and "may" have mentioned that Miller might take Swint into custody, *id.* at 13 (*see* App. at 197).[6]

Although Swint did confer with Smith prior to making statements to the DEA agents,

4. The first four of these factual findings are undisputed, and the fifth is supported adequately by the record.

5. Our listing of this factor does not imply that an attorney can protect his client best by walking out before interrogation takes place and then claiming that there was a *Miranda* violation or that a statement was involuntary. Thus, we do

not intend to foreclose the possibility that the presence of counsel in other situations could ameliorate the potentially coercive effects of the government's conduct.

6. The government points out that confronting a defendant with evidence of his guilt, even if fabricated, does not render a subsequent confession involuntary. Govt.Br. at 41 (citing *Evans v.*

the district court found that "[n]o one told Smith that Swint's statements to federal authorities could be used against Swint," and that both Swint and Smith believed Swint's statements to the DEA agents would be off-the-record. *Id.* at 19–20 (*see* App. at 203–04). Moreover, the government concedes that Swint was not given *Miranda* warnings while at the District Attorney's office. Thus, the district court's findings of fact, which the record amply supports, indicate that the state and federal authorities used a coercive "bait-and-switch" technique, first by leading Swint and his attorney to believe Swint's statements would not be used against him and then by depriving Swint of that protection without giving him *Miranda* warnings.

Our conclusion that Swint's statements were involuntary is consistent with the opin-

ion of the Court of Appeals for the Fifth Circuit in *United States v. Rogers*, 906 F.2d 189 (5th Cir.1990), a case similar to this one. In *Rogers*, representatives of the local sheriff's department told the defendant he would not be charged with criminal conduct if he cooperated with them. *Id.* at 190. A few days later, the defendant received a call from the sheriff's department advising him that somebody wanted to talk to him. *Id.* Once he arrived at the sheriff's department, the defendant was questioned by a federal agent who began by reading him his *Miranda* rights and getting him to sign a waiver. Although the defendant in *Rogers*, unlike Swint, was given *Miranda* warnings and signed a waiver, the court held that his confession "was not voluntary for purposes of the Fifth Amendment." [7] This case presents an even more egregious and coercive "bait-

---

*Dowd*, 932 F.2d 739, 740, 742 (8th Cir.) (per curiam), *cert. denied,* —— U.S. ——, 112 S.Ct. 385, 116 L.Ed.2d 335 (1991); *Derrick v. Peterson*, 924 F.2d 813, 819 (9th Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 161, 116 L.Ed.2d 126 (1991); *United States v. Carter*, 910 F.2d 1524, 1529 (7th Cir.1990), *cert. denied,* 499 U.S. 978, 111 S.Ct. 1628, 113 L.Ed.2d 724 (1991); *Ray v. Duckworth*, 881 F.2d 512 (7th Cir.1989); *Green v. Skully*, 850 F.2d 894 (2d Cir.), *cert. denied,* 488 U.S. 945, 109 S.Ct. 374, 102 L.Ed.2d 363 (1988)).

However, a "[d]etermination of whether a statement is involuntary 'requires more than a mere color-matching of cases.' ... It requires careful evaluation of all the circumstances of the interrogation." *Mincey v. Arizona*, 437 U.S. 385, 401, 98 S.Ct. 2408, 2418, 57 L.Ed.2d 290 (1978) (citations omitted). The structure of the interrogations caused Swint to believe that the DEA agents would not attempt to use his statements against him, when in fact they considered themselves to be under no such constraint. Although misleading an accused about the evidence against him might not render a confession involuntary, misleading him about whether his confession may be used against him should have that consequence in the circumstances of this case. As the Supreme Court has recognized, "the 'blood of the accused is not the only hall mark of an unconstitutional inquisition.' " *Id.* (citation omitted).

7. We have considered *United States v. Long*, 852 F.2d 975 (7th Cir.1988), and *United States v. Contreras*, 755 F.2d 733 (9th Cir.), *cert. denied,* 474 U.S. 832, 106 S.Ct. 100, 88 L.Ed.2d 81 (1985), as they also involved situations in which the United States prosecuted defendants originally being prosecuted or investigated by state au-

thorities. However, these cases are distinguishable from this case. *Long* involved a defendant who cooperated with state authorities in exchange for the promise of a reduced state sentence. His statements to the state authorities were used as evidence in a federal prosecution in which he unsuccessfully challenged their voluntariness.

*Long* is distinguishable from this case because, as explained in *Rogers*, in *Long* the federal government had no knowledge of or role in the state authorities' activities and " 'did nothing to deceive [the defendant] ... or elicit his statement.' " *Rogers*, 906 F.2d at 192 (quoting *Long*, 852 F.2d at 976). Moreover, in *Long*, "the state officials acted appropriately throughout." *Long*, 852 F.2d at 978. Accordingly, the *Long* court concluded: "[i]n the absence of misstatement, trickery, or deception we fail to see how Long's statement is involuntary." *Id.* Thus, *Long* is distinguishable because it did not involve the deceptive "bait-and-switch technique" employed by the state and federal authorities in this case.

In *Contreras*, the defendants gave information to state authorities under a state grant of immunity. The defendants later gave statements to the federal authorities, and these statements to the federal authorities were used against them in a federal prosecution. The defendants unsuccessfully challenged the use of the statements. *Contreras* was distinguished in *Rogers* because "[e]ach defendant was advised of his *Miranda* rights before talking with federal agents [and] [t]he trial court found that the federal warnings should have put the defendants on notice 'that the state immunity could not have any effect upon a federal prosecution.' " *Rogers*, 906 F.2d at 192 (quoting *Contreras*, 755 F.2d at 737). It is similarly distinguishable here because the federal agents did not put Swint on notice that his ar-

and-switch," inasmuch as state and federal authorities questioned Swint on the same day, and did not give him *Miranda* warnings or communicate to him or his attorney that his statements to federal agents were not off-the-record. Thus, *Rogers* provides a compelling precedent for our conclusion that we should affirm the district court's order suppressing Swint's statements to the DEA agents as involuntary.[8]

### III. CONCLUSION

Insofar as the United States has appealed from the order of April 28, 1993, it will be affirmed.

rangement for an off-the-record discussion with the state authorities did not apply to his discussions with them. *See also United States v. Hooton*, 662 F.2d 628, 631 & n. 1 (9th Cir.1981) ("[O]nce the government has granted immunity to a person, if the government later wishes to question that person with a view toward using the answers against him or her, the government has the responsibility of giving specific notice that the immunity previously granted is being withdrawn. In this case, [the defendant] ... received such notice," as he was given a *Miranda* warning and signed a written waiver, stating he was responding voluntarily without any promise of immunity.), *cert. denied*, 455 U.S. 1004, 102 S.Ct. 1640, 71 L.Ed.2d 873 (1982).

8. Of course, we base our result on the "totality of circumstances." *See United States ex. rel. Hayward v. Johnson*, 508 F.2d at 326. Thus, it cannot be assumed that we would have reached the same result if any of the factors indicating that the statements were not voluntary had not been present.