**UNITED STATES of America**

v.

**Nicholas Frank PALERMO.**

**Criminal No. 94–35 Erie.**

United States District Court, W.D. Pennsylvania.

April 14, 1995.

---

Jay J. Finkelstein, Federal Public Defender's Office, Erie, PA, for defendant Nicholas Frank Palermo.

James D. Donovan, Assistant U.S. Attorney, United States Attorney's Office, Erie, PA, for U.S.

## MEMORANDUM OPINION AND ORDER

McLAUGHLIN, District Judge.

Defendant Nicholas Frank Palermo was indicted on November 30, 1994 for alleged bank fraud in violation of 18 U.S.C. §§ 1344 and 2. In essence, the indictment avers that Defendant, together with another individual, executed or attempted to execute a scheme and artifice to fraudulently obtain funds from Marine Bank, a federally insured financial institution, by knowingly depositing stolen checks into Defendant's savings account at Marine Bank and later withdrawing the proceeds. The alleged loss of funds to Marine Bank as a result of these events is $98,143.83.

Presently before the Court is Defendant's motion to suppress various incriminating statements allegedly made by him in conversations with agents for the Federal Bureau of Investigations and during a civil deposition. The bases for this motion are that the alleged statements were taken in violation of Defendant's various rights under the Fifth and Sixth Amendments to the United States Constitution. Both parties have submitted memoranda in support of their respective positions and the Court held an evidentiary hearing on March ¹⁰ ¹995. For the reasons stated more fully bౖᵧ, the Court will deny Defendant's motion to ⸮uppress.

## I. BACKGROUND

At the March 13, 1995 hearing, evidence was presented regarding Defendant's various contacts with two FBI agents, Andrew Palumbo and Eugene Zorn. Special Agent Palumbo is a supervisory agent operating out of the FBI's Newark, New Jersey division and specializing in white collar crime. (TR 14–15.) He testified to having had approximately nine separate contacts with Defendant—by telephone, mail, and in-person meetings—between December 9, 1992 and February 8, 1993. Agent Zorn is assigned to the FBI's Erie, Pennsylvania office and likewise specializes in white collar criminal matters. (TR 58–59.) He testified about three interviews with Defendant which occurred during the months of February and September of 1993. Much of the evidence concerning Defendant's contacts with the two agents is not in dispute.

For example, Agent Palumbo testified that Defendant initially telephoned him on December 9, 1992 and related at that time that Defendant was sending a package containing copies of various checks which had been stolen from an armored vehicle in Buffalo, New York. (TR 15.) Agent Palumbo received the package on December 15, 1992. The package did indeed contain photocopies of a series of checks, although only the front sides of the checks were photocopied. (TR 16–17.) According to Agent Palumbo, this information was not particularly useful to the FBI because, without seeing the reverse sides of the checks, Agent Palumbo was unable to verify whether or not the checks were actually stolen. (TR 17.) Agent Palumbo testified that the front sides of the photocopied checks match those which are the subject of Defendant's present indictment. (Id.)

On or around the day he received the package of photocopied checks, Agent Palumbo also received a telephone call from Defendant. At that time Defendant provided the name of the individual who had given him the stolen checks, one Dana Dolson.[1] (TR 18.) Agent Palumbo testified that, during this same conversation, Defendant indicated his awareness that the subject checks had been stolen. Agent Palumbo further testified that he specifically instructed Defendant not to cash the checks because "it would be a violation of law." (TR 18–19.)[2]

---

1. The record indicates that this is a phonetic spelling. (TR 18.)

2. Agent Palumbo testified that on at least four separate occasions he advised Defendant not to

The next contact between Defendant and Agent Palumbo occurred on December 22, 1992, when Defendant telephoned Agent Palumbo and requested a meeting at a shopping plaza in Union, New Jersey. (TR 19.) The two men met as agreed and, during the course of their conversation, Defendant allegedly reiterated his awareness that the subject checks had been stolen. (TR 19.)

Two days later, Defendant again telephoned Agent Palumbo. The purpose of this telephone call was apparently to provide Agent Palumbo the full name of the stolen check supplier, that being Dana Adolphson. (TR 20.)

On January 15, 1993, Defendant again contacted Agent Palumbo, requesting that the two meet in Newark, New Jersey. At this meeting, Defendant informed Agent Palumbo that he had opened a checking account with a New Jersey bank and that he intended to deposit approximately $45,000 into the account. Defendant showed Agent Palumbo a bank book evidencing the newly opened account and further informed Agent Palumbo that the intended $45,000 deposit consisted of proceeds from the stolen checks which had been placed into Defendant's Erie bank account. (TR 20–21.) Defendant was again advised by Agent Palumbo that he should not follow through with this course of action, as it would be a violation of law. (TR 21.)

Notwithstanding this advice, at some point after the January 15, 1993 meeting Agent Palumbo received a letter from Defendant via the U.S. mail at his Newark office. This letter described five checks which had been deposited into various accounts. Agent Palumbo testified at the suppression hearing that at least three of these checks form the basis of the present indictment. (TR 23.)

Agent Palumbo next met with Defendant on February 7, 1993 in Piscataway, New Jersey. Once again, this meeting was arranged at Defendant's request. Agent Palumbo described the substance of this meeting as follows:

... Mr. Palermo told me that he had been in contact with Dana [Adolphson], and that

cash the subject checks because to do so would be illegal. (TR 24.)

he was offered additional checks, checks he described only as from a steel mill company, not further identified, and also Woolworth Company checks. He said he was going to process these checks and he was going to work out a 70–30 split with Dana [Adolphson] as a result of the proceeds. Q. Did you give him any advice regarding the handling of these checks? A. I reiterated the importance that he could not cash these checks because it was a violation of law. (TR 23–24.)

Finally, Defendant contacted Agent Palumbo by telephone on February 8, 1993. (TR 52.) During this conversation, Defendant indicated that he had been contacted by the FBI in Erie, Pennsylvania and requested assistance from Palumbo "concerning the nature of the contact." (TR 53.) Agent Palumbo testified that he advised Defendant to be completely "trustworthy and up front" with the agents and to answer all their questions truthfully. (Id.)

It is undisputed that all of the substantive contacts and meetings discussed above were initiated by Defendant. (TR 24, 55.) Agent Palumbo did admit that he may have attempted (unsuccessfully) to reach Defendant by telephone "one or two times," that Defendant was instructed "if he ever had any information to contact [Palumbo]" and that Agent Palumbo asked Defendant "to find out as much information as he could" about the armored car incident. (TR 32, 35, 40, 58.) Moreover, Agent Palumbo acknowledged that Defendant had previously acted as a confidential informant for the FBI from February 19, 1986 through March 4, 1988, and again from May 11, 1988 through May 4, 1990. (TR 25, 28–32, 34.) Nevertheless, according to Agent Palumbo, Defendant did not enjoy the status of a confidential informant during the indictment period at issue.[3] Furthermore, the photocopied checks provided by Defendant were not particularly useful to Agent Palumbo. (TR 25–26, 31–32, 34–37, 42–43.)

The Court also heard testimony from FBI Special Agent Eugene Zorn at the March 13

3. The indictment in this case covers the period from December, 1992 through February, 1993.

hearing. Agent Zorn testified that he first became involved in the investigation of this case after receiving a telephone call from a Marine Bank security officer who indicated that the bank had sustained a loss of approximately $100,000 due to a fraud involving Defendant. (TR 59.)

Agent Zorn first spoke with Defendant on February 5, 1993 during a meeting at Marine Bank. The purported reason for this meeting was that Defendant would meet with the bank officials to explain his situation and return the money. (TR 60.) Aside from Defendant and Agent Zorn, two employees of the bank were present on this occasion. (TR 60.)

During the February 5 meeting, Defendant allegedly informed Agent Zorn that he had received approximately twelve stolen checks and that he had deposited six of them, or arranged for them to be deposited, into his account at Marine Bank. (TR 61.) Defendant further admitted having withdrawn the proceeds from the checks, diverting some $52,000 into an annuity with an Ohio insurance company. (TR 63.) According to Agent Zorn, Defendant indicated that "he would make the bank whole as soon as he got clearance to return the money." (TR 62.) Of the remaining six checks, Defendant allegedly indicated that two were in his possession and the other four had been deposited into other individuals' accounts.

On February 8, 1993, Agent Zorn again interviewed Defendant at the latter's business office. During this interview, Defendant maintained that he was assisting Agent Palumbo in connection with the present case. (TR 74.) Among other things, Defendant allegedly informed Agent Zorn once again that he had placed approximately $52,000 into an insurance annuity in his own name, and that an additional $45,000 was going to be placed in various New Jersey accounts to assist Agent Palumbo's investigation. (TR 74–75.) Once again, Defendant indicated his awareness that the checks had been stolen. Further, Defendant advised Agent Zorn that he had arranged a 70–30 split of the proceeds with Dana Adolphson, and that he had already paid Adolphson approximately $10,000 to $15,000 of the money. (TR 76.) Either

during the February 5 meeting or the February 8 meeting, the Defendant was shown photocopies of six checks, which Defendant acknowledged had been deposited into his account. Defendant further acknowledged that the six checks were stolen. (TR 72–73.)

Agent Zorn testified that, during the February 8 meeting, he prepared a written summary of everything Defendant had related to him and Defendant verbally acknowledged the accuracy and truth of the statement. (TR 77–78.) At Defendant's suggestion, a call was then placed to Agent Palumbo to verify Defendant's representations about his working for the FBI. (TR 77.) According to Agent Zorn, Agent Palumbo denied both that Defendant was working for the FBI as an informant and that Defendant had deposited the stolen checks at the direction of the FBI. (TR 77–78.) At that point, Defendant allegedly indicated that he had "nothing further to say." (TR 78.) It is undisputed that the written statement was never signed by Defendant. (Ex. G–2.)

Agent Zorn's third interview with Defendant occurred on September 7, 1993 at the Erie County Prison, where Defendant was incarcerated for an unrelated state conviction. (TR 79–81.) This meeting was initiated when Defendant's attorney, Lawrence D'Ambrosio, contacted Agent Zorn and informed him that Defendant "wanted to cooperate." (TR 80.) According to Agent Zorn, Defendant did not offer any new information at this meeting and "wasn't changing his story." (TR 81.) Defendant stated once again that he had deposited or caused to be deposited the subject checks into his account, later withdrawing the money, and that he was doing this to assist Agent Palumbo in New Jersey. (TR 82.) Defendant further discussed his use of the check money to purchase an insurance annuity as well as his arrangement with Dana Adolphson to split the proceeds from the checks. (TR 83.) Defendant also informed Agent Zorn of two other individuals who had received some of the proceeds and acknowledged that he himself had spent $20,000 of the money on a trip to Hawaii. (TR 83–84.)

At the suppression hearing the government offered into evidence a transcript of

Defendant's deposition which was taken on April 20, 1993 in connection with Marine Bank's civil action against Defendant for replevin. (Ex. G–1.) During the deposition, Defendant answered certain questions concerning his involvement with the stolen checks and refused to answer others, asserting his Fifth Amendment privilege against self-incrimination. At all times during the deposition, Defendant was represented by Attorney Gustave McGeorge. (TR 4, 115.) It is not contended that any law enforcement officials were present or participated in the April 20 deposition in any manner and, in fact, the evidence is to the contrary. (TR 5.)

Finally, the Court heard testimony from Defendant at the suppression hearing about the various conversations Defendant had with Agents Palumbo and Zorn. Although most of the foregoing allegations are undisputed, Defendant takes the position that, in providing information to Agent Palumbo regarding the present matter and in handling the stolen checks, Defendant was working for the FBI in the capacity of a confidential informant. (TR 102.) Defendant testified that he had a long-standing relationship with Palumbo and an "agreement" that "if I got in trouble and needed his help, he would take care of me, I would take care of him." (TR 100.) Although he admitted that he was never paid anything for his services, Defendant testified that Agent Palumbo helped out two of Defendant's friends in 1987 and 1988 pursuant to their agreement. (TR 101, 111–12.) However, Defendant also admitted that, in his own view, his status as an FBI informant had not been continuous:

Q. You indicated that your relationship with the FBI was off and on?

A. Yes.

Q. So it wasn't a continuous thing starting in 1986?

A. It wasn't straight through the line. I mean, I would be working on the job, Andy [Palumbo] would come down and see me, ask what's going on, if I knew anything ... He asked me to see if I could find certain things that he would need in relationship to some information from the unions, this and that. And that would be about the extent. When I would find out, I would let him know. (TR 109–110.)

Regarding his contacts with Agent Zorn, Defendant testified that he did not receive Miranda warnings prior to either the February 5 or February 8, 1993 interview meetings. (TR 103–105.) Defendant stated at the suppression hearing that, had he been read his Miranda rights prior to these two interviews, he would not have spoken at all to Agent Zorn. (*Id.*) Moreover, Defendant denied ever having adopted or approved the written statement prepared by Agent Zorn on February 8. (TR 105–06.) Defendant also testified, with respect to the September 7, 1993 meeting at the Erie County Jail, that he talked to Agent Zorn based upon his attorney's advice and that he was unable to have "gotten up and walked away" from the interview due to his incarceration. (TR 106, 114.)

## II. *STANDARD OF REVIEW*

Defendant has moved this Court to suppress the statements outlined above on the ground that they were taken in violation of Defendant's Fifth and Sixth Amendment rights.[4] On a motion to suppress, the controlling burden of proof imposes no greater burden than proof by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 177 n. 14, 94 S.Ct. 988, 996 n. 14, 39 L.Ed.2d 242 (1974). Moreover, the government, as the proponent of the evidence, must bear the burden of proving its admissibility. *See United States v. Coades*, 468 F.2d 1061,

---

4. Defendant's motion asserts four bases for the exclusion of his various alleged statements:
 (a) Mr. Palermo [was] in custody within the meaning of *Miranda v. Arizona*, 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694] (1966) and was not fully advised of his rights as required by that decision, in violation of the Fifth Amendment to the United States Constitution;
 (b) the statement was taken in violation of Mr. Palermo's Sixth Amendment right to counsel;

 (c) any alleged waiver by the defendant of his Fifth and Sixth Amendment rights was not a knowing, voluntary and intelligent waiver;
 [d] Mr. Palermo's statements were involuntary, in violation of his right to due process of law.
 (Def.'s Mot. to Suppress at 1–2.)

1064 (3d Cir.1972); *United States v. Colbert,* No. 89–310, 1990 WL 5200, at *1 1990 U.S.Dist. LEXIS 707 (D.N.J. January 23, 1990) at *1 (citing *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). With these standards in mind, we turn to an analysis of Defendant's various arguments.

## III. *DISCUSSION*

Defendant's first asserted ground for suppression is that his various alleged statements were taken in violation of the Fifth Amendment guarantee against compulsory self-incrimination.[5] In *Miranda v. Arizona,* 384 U.S. 436, 478–79, 86 S.Ct. 1602, 1629–30, 16 L.Ed.2d 694 (1966), the Supreme Court first pronounced the now well-established rule that, prior to engaging in a custodial interrogation, police must intelligibly explain to a suspect that he has the right to remain silent, that his statements may be used against him at trial, that he has the right to the presence of an attorney, and that if he cannot afford to hire an attorney one will be appointed to represent him. *See also Duckworth v. Eagan,* 492 U.S. 195, 201–2, 109 S.Ct. 2875, 2879–80, 106 L.Ed.2d 166 (1989).

■ Defendant maintains that the *Miranda* doctrine is applicable here because—at the time of making the alleged incriminating statements—he was "in custody" within the meaning of that decision. Whether an individual is in custody depends upon the circumstances of each particular case. *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (per curiam). However, "[i]t is settled that the safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.' " *Berkemer v. McCarty,* 468 U.S. 420, 440, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984) (citing *California v. Beheler, supra,* at 1125, 103 S.Ct. at 3520). The relevant inquiry for purposes of determining whether an individual is in custody at a particular time "is how a reasonable man in the suspect's position would have understood his situation." *Berkemer, supra,* at 442, 104 S.Ct. at 3151.

■ Applying these guidelines, the Court finds that none of Defendant's contacts with Agent Palumbo as outlined above constituted "custodial interrogation" within the meaning of *Miranda.* It is undisputed that all of Agent Palumbo's substantive contacts with Defendant were initiated by the latter. Some of Defendant's statements to Agent Palumbo were made by telephone or by letter. As to their in-person meetings, Agent Palumbo testified that Defendant was never placed in custody or charged with a crime, and all of the information provided was volunteered by Defendant. (TR 24; 55.) Defendant offered no testimony to the contrary, but maintained that he was operating in the capacity of a confidential informant for the FBI. (TR 102.) While the Court makes no determination here of this ultimate issue of fact, the Court does note that the record before it contains no evidence that Defendant was promised immunity, remuneration, or any other benefit in exchange for the information he gave in the instant case. Thus, for purposes of ruling on Defendant's suppression motion, the Court concludes that Defendant's various contacts with Agent Palumbo were not privileged and did not otherwise constitute compelled testimony in violation of the Fifth Amendment.

■ The Court likewise finds that Defendant's two interviews with Agent Zorn in February, 1993 were not "custodial interrogations" within the meaning of *Miranda.* At the February 5 meeting at Marine Bank, two officers of the bank were present along with Agent Zorn and Defendant. (TR 60.) At the February 8 meeting, which occurred at Defendant's place of business, other people were close by outside the office where Agent Zorn and Defendant talked. (TR 73.) Agent Zorn testified that, during both of these interviews, no promises or threats were made to Defendant in return for his information, Defendant was never in custody, restrained, or placed under arrest, and Defendant was

---

**5.** It is undisputed that Defendant was not read his Miranda rights during any of the contacts outlined above. (TR 53–55; 84.)

free to leave the interviews at any time. (TR 60–61; 73–74.) Defendant did not contradict this testimony but simply maintained that, if he had been given Miranda warnings, he would not have spoken with Agent Zorn. The Court concludes that neither of these interviews took place in the type of "police dominated" atmosphere in which the *Miranda* ruling has been applied, nor was Defendant's freedom of movement sufficiently restrained such that he could reasonably have believed himself to be in federal custody. *See Berkemer v. McCarty,* 468 U.S. at 438–39, 104 S.Ct. at 3149–50 (citations omitted); *California v. Beheler,* 463 U.S. at 1125, 103 S.Ct. at 3520.

■ Both parties seem to concede that Defendant was "in custody" during his September 7, 1993 meeting with Agent Zorn at the Erie County Jail. However, on that particular occasion, Defendant—through his counsel—sought out Agent Zorn for purposes of cooperating with the FBI. (TR 80–81.) Only Defendant, his attorney, and Agent Zorn were present at the interview, which lasted approximately 15 minutes. *Id.* Again, no promises or inducements were made to Defendant in return for any information, there is no evidence of any coercive behavior by Agent Zorn, and the latter testified that Defendant "really had nothing else new to offer" at this meeting. (TR 81, 114–15.) Although Defendant obviously was not free to leave the prison, he had counsel present and presumably could have terminated the interview at any point and returned to his cell. (TR 84, 114.) In light of these facts, the Court has some doubt as to whether the September 1993 meeting with Agent Zorn was a "custodial interrogation," notwithstanding Defendant's incarceration. Even if the interview was custodial, however, the Court is satisfied that Defendant's voluntary statements made in the presence of— and upon the advice of—counsel constituted a knowing, intelligent, and voluntary waiver of his Fifth Amendment privilege against self-incrimination.[6] *See Colorado v. Connelly,* 479 U.S. 157, 168, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986) (government need prove

waiver of *Miranda* rights only by a preponderance of the evidence).

■ Finally, with respect to Defendant's civil deposition conducted in April of 1993, it is undisputed that no government officials were involved or even present on that occasion. There is evidence that neither Agent Zorn nor anyone else from the FBI contacted Marine Bank's attorney until after the deposition had taken place. (TR 7–8, 88.) Moreover, Defendant was represented by counsel throughout the deposition and attempted to assert his Fifth Amendment privileges on various occasions. (TR 4, 107, 115–16 and Ex. G–1.) Because the deposition did not involve any form of governmental coercion or interrogation, Defendant's Fifth Amendment rights were not implicated and no *Miranda* warnings were required.

■ Defendant's second argument for suppression is that the alleged statements were taken in violation of his Sixth Amendment right to counsel. Is it fundamental that this constitutional protection attaches only with "the initiation of adversary judicial proceedings" against the suspect—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment. *Michigan v. Jackson,* 475 U.S. 625, 629, 106 S.Ct. 1404, 1407, 89 L.Ed.2d 631 (1986) (quoting *United States v. Gouveia,* 467 U.S. 180, 187, 188, 104 S.Ct. 2292, 2296, 2297, 81 L.Ed.2d 146 (1984)); *Brewer v. Williams,* 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977) (quoting *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972) (plurality opinion)). Thereafter, government efforts to elicit information from the accused, including interrogation, represent "critical stages" at which an accused has the right to have counsel present under the Sixth Amendment.

■ As is evident from the Court's recitation of the testimony presented at the March 13 hearing, all of Defendant's alleged incriminating statements to Agents Palumbo and Zorn—as well as any statements made during his civil deposition—were made prior to Defendant's November 30, 1994 indictment.

---

**6.** Because counsel was present during the jailhouse interview, only Defendant's right to remain silent was implicated by a lack of *Miranda* warnings.

Thus, Defendant's right to counsel under the Sixth Amendment had not yet attached. Moreover, both Defendant's statements to Agent Zorn on September 7, 1993 and his statements made during his April, 1993 civil deposition were taken with counsel present. In sum, there is no Sixth Amendment ground for suppressing any of Defendant's statements.

Defendant's third asserted basis for suppression is that "any alleged waiver by the defendant of his Fifth and Sixth Amendment rights was not a knowing, voluntary and intelligent waiver." (Def.'s Mot. to Suppress at 2.) Given the Court's previous disposition of Defendant's first two arguments, it is not necessary to address this argument in further detail. We will therefore turn to Defendant's fourth asserted basis for suppression: that any statements made by Defendant were involuntary in violation of his right to due process of law.

Even if a statement is admissible under the Fifth Amendment Self–Incrimination Clause, it must be excluded if it was involuntarily made in violation of the individual's due process rights. *Lego v. Twomey,* 404 U.S. 477, 478, 92 S.Ct. 619, 621, 30 L.Ed.2d 618 (1972); *U.S. v. Swint,* 15 F.3d 286, 288–89 (3d Cir.1994). It is the government's burden to prove by a preponderance of the evidence that any statements made by Defendant were given voluntarily. *U.S. v. Swint, supra,* at 289; *United States ex rel. Hayward v. Johnson,* 508 F.2d 322, 326 (3d Cir.1975) (citing *Lego v. Twomey, supra,* at 487–89, 92 S.Ct. at 625–26, *cert. denied,* 422 U.S. 1011, 95 S.Ct. 2637, 45 L.Ed.2d 675 (1975)).

In determining whether a confession was voluntary, the Court must satisfy itself that the confession was "the product of an essentially free and unconstrained choice by its maker," that it was "the product of a rational intellect and a free will," and that the individual's will was not "overborne." *U.S. v. Swint, supra,* at 289 (citing *United States ex rel. Hayward v. Johnson, supra,* at 326). The Supreme Court recently spoke to this issue in *Withrow v. Williams,* 507 U.S. 680, 693, 113 S.Ct. 1745, 1754, 123 L.Ed.2d 407 (1993), wherein the Court stated:

[C]ourts look to the totality of circumstances to determine whether a confession was voluntary. Those potential circumstances include not only the crucial element of police coercion, . . . the length of the interrogation, . . . its location, . . . its continuity, . . . the defendant's maturity, . . . education, . . . physical condition, . . . and mental health. (Citations omitted.) They also include the failure of police to advise the defendant of his rights to remain silent and to have counsel present during custodial interrogation. (Citations omitted.)

Unless there is police conduct causally related to a defendant's confession, the confession is considered voluntary. Thus, a court will not hold that a confession was involuntary unless it finds that it was the product of "police overreaching." *United States v. Swint, supra,* at 289 (citing *Colorado v. Connelly,* 479 U.S. 157, 164, 107 S.Ct. 515, 520, 93 L.Ed.2d 473 (1986)).

Upon examination of the totality of circumstances here, the Court finds that Defendant's various statements to Agents Palumbo and Zorn, as well as his statements made at deposition, were voluntary and were not the result of any overreaching by the federal agents. As the Court has previously noted, all of Defendant's substantive contacts with Agent Palumbo were initiated by Defendant himself. Defendant was never placed in custody by Agent Palumbo, nor was he ever offered any specific inducement or remuneration for his information regarding the instant case. Defendant's contention that he believed he was operating as a confidential informant for the FBI is not sufficient to render his various statements involuntary, especially in the absence of any definite promises or guarantees of immunity by Agent Palumbo.

The Court likewise finds that Defendant's statements to Agent Zorn were voluntary. The Court has previously observed that the two interviews on February 5 and 8, 1993 were conducted in a non-custodial setting without any threats, inducements or other forms of coercion. At all times, Agent

Zorn identified himself as an investigatory agent of the FBI. Defendant appears to be a mature, reasonably educated and mentally healthy individual. Defendant's only evidence of involuntariness is his self-serving assertion that, if he had been given a *Miranda* warning beforehand, he would not have spoken to Agent Zorn. As to Defendant's contact with Agent Zorn at the Erie County prison, it is undisputed that Defendant's attorney initiated that particular meeting and remained present throughout the interview. No threats, promises or inducements were made by Agent Zorn in exchange for Defendant's statements. In sum, the Court is satisfied that Defendant's various statements to the federal agents were voluntary and were not the result of any governmental overreaching.

■ Because the Defendant's civil deposition was conducted without the presence or involvement of governmental agents, there is no basis for suppression of those statements on due process grounds. Defendant's fourth argument for suppression therefore fails.

## IV. *CONCLUSION*

For the foregoing reasons, the Court concludes that Defendant's motion to suppress must be denied. An appropriate order follows.

### *ORDER*

AND NOW, this 14th day of April, 1995, for the reasons stated in the accompanying Memorandum Opinion, IT IS HEREBY ORDERED that Defendant's Motion to Suppress Statements [Doc. No. 22] is DENIED.