**UNITED STATES of America**

**v.**

**David A. SALISBURY.**

**No. CR 97–S–74–NE.**

United States District Court,
N.D. Alabama,
Northeastern Division.

May 7, 1997.

Addendum Supplementing Opinion
May 9, 1997.

James T. Baxter, III, Berry, Ables, Tatum, Baxter, Parker & Hall, P.C., Huntsville, AL, for defendant.

Caryl Privett, U.S. Atty., Herbert H. Henry, III, U.S. Attorney's Office, Birmingham, AL, Victor Conrad, U.S. Attorney's Office, Huntsville, AL, for U.S.

## MEMORANDUM OPINION

ACKER, District Judge.

On May 5, 1997, this court heard evidence and oral argument in support of and in opposition to the motion of David A. Salisbury ("Salisbury"), defendant in the above-entitled criminal action in which Salisbury is charged under 18 U.S.C. § 1001 with giving false information to the Tennessee Valley Authority regarding Salisbury's eligibility for temporary living expenses. The suppression motion arises out of an interview of Salisbury by W. Chris McRae ("McRae"), a Special Agent for the office of the Inspector General, conducted on June 20, 1995. The question presented by Salisbury's motion, simply stated, is whether or not the information Salisbury provided during the interview contained self-incriminating material imparted involuntarily and in violation of Salisbury's Fifth Amendment protection against self-incrimination and/or his Fifth Amendment right to due process of law. To the extent the material obtained during the interview led to other inculpatory material, that material would, of

course, be the fruit of the poisoned tree, that is, if the tree was indeed poisoned.

Once Salisbury claimed, as he did, that his statements were involuntary, the burden was clearly upon the United States to prove by a preponderance of the evidence that Salisbury's statements were voluntary. *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972). The "old" Fifth Circuit in 1972 described the current inquiry in the following way:

> · Appellant's third specific argument regarding the voluntariness of his confession is that this is a case of *involuntariness due to an accumulation of psychological pressures constituting impermissible coercion*. That argument, much like the other voluntariness claims, may be logical, but the test is not whether appellant's view of the case is believable. Rather, *the courts entrust to a factfinder, here the district judge, the serious duty of determining exactly what factual events occurred*. His declaration of the facts will not be disturbed on appeal absent serious or plain error.
>
> *Admittedly. it is the government that bears the "heavy burden" of demonstrating that a criminal confession was in fact and in law voluntary . . . .*

*United States v. Bailey*, 468 F.2d 652, 660 (5th Cir.1972) (emphasis supplied).

During the suppression hearing, this court not only received written materials but evaluated the demeanor of the only two witnesses, Salisbury and McRae. To use the Fifth Circuit's language in *Bailey*, this court came to the conclusion, and conveyed it orally (reserving the right to write an opinion) that "this is a case of involuntariness due to an accumulation of psychological pressures constituting impermissible coercion." The facts that led this court to such a conclusion are as follows.

### Findings of Fact

Despite an absence of arrest power, McRae obviously knew how to interview the target of a possible criminal proceeding if the suspected conduct was within his investigative sphere. He had conducted confrontational interviews before June 20, 1995, without any participation by a law enforcement official having arrest power. He knew how to give a *Miranda* warning but did not give one to Salisbury.

On September 1, 1994, the office of the Inspector General of the Tennessee Valley Authority in Knoxville, Tennessee, received an anonymous letter suggesting that Salisbury's employer, Stone & Webster Engineering Company, a TVA contractor at the Brown Ferry Nuclear Facility, had inspector-employees who were receiving pay as "temporary" Alabama residents while not entitled to be classified as such. On the bottom of the letter some official, in handwriting, referred the letter to McRae for investigation by the following note:

> "Chris—why don't we use this as a control file to kick out individual cases?"

This obviously implied an investigative focus on possible fraudulent claims by at least some of Stone & Webster's inspectors. It did not have to refer to 18 U.S.C. § 1001 for McRae then to know what to look for and where to look.

Thereafter, McRae picked the ten Stone & Webster inspectors who had, since Stone & Webster received its TVA contract, received the most money in "temporary" allowances. These ten were thereupon obviously targeted for criminal investigation.

Before interviewing Salisbury on June 20, 1995, McRae had already obtained a copy of the form strangely filled out and submitted by Salisbury on May 15, 1995 (long after the anonymous letter of September 1, 1994, but shortly before his interview by McRae), by which Salisbury certified as a means of obtaining "temporary assignment expense reimbursements" that his "permanent place of residence immediately prior to undertaking my current temporary assignment" is "2600 Country Creek Ln., Ft. Worth, Texas 76123," and further certifying that his "temporary place of residence for the duration of his temporary assignment" is "219 Sunset Circle W., Madison, AL 35758." This document is the document upon which the United States relies as the basis for Count Two of its indictment charging Salisbury with "knowingly and willfully" making and causing to be made a false writing on March 15, 1995.

When Salisbury came to the Browns Ferry Nuclear Facility from Ft. Worth, it was anyone's guess how long the project would last. Nuclear work can last six months or ten years. Volatility is its middle name. Anybody who moves to such a job can certainly claim "temporary" status for some period of time. The moment at which such a transient becomes a "permanent" resident can be a matter for legitimate debate, meaning that the government's delay in indicting Salisbury may be explained by a doubt about its ability to obtain a conviction even with the right to use all of the evidence here being suppressed.

When McRae told Stone & Webster that he wished to interview Salisbury, a managerial employee higher than Salisbury's immediate supervisor gave Salisbury a written instruction to report to McRae for interview at a location on the TVA reservation distant from the Stone & Webster office. The "boss" did not *ask* Salisbury if he would *like* to be interviewed. He gave Salisbury a direct order, that, if Salisbury had not obeyed, would have constituted insubordination and an offense calling for termination. Such a written direction to an employee from an employer is as strong as a subpoena, maybe stronger.

Salisbury understandably followed the order, driving his car to the designated building in which McRae awaited. Salisbury entered a room approximately 10' × 10' containing one desk and one chair and no other furniture. McRae introduced himself and presented Salisbury a card. The card contained McRae's name, following by his title, "United States Government Office of the Inspector General, Regional Special Agent." More significant and ominous was the prominent appearance on the card of a gold embossed badge. The door was closed. Although the door was not locked, McRae's badge psychologically turned the key in the lock. There were no windows. McRae was silent as to whether or not Salisbury was free to leave or to break off the conversation. Instead, McRae assured Salisbury that he had nothing to worry about and was not a target of any criminal investigation involving what, in fact and law, was Salisbury's "permanent residence," or that there might be criminal significance to the ascertainment of what was, in fact and law, Salisbury's "permanent residence."

Feeling a subtle but a powerful combination of pressure and relief, Salisbury told McRae, *inter alia*, that he had purchased a house in Madison, Alabama, and that he and his wife and children were living there and his children were in school. Arguably, the setting was custodial, at least in the mind of Salisbury, but it was also a setting in which McRae impliedly promised Salisbury no possibility of criminal exposure.

Under the theory of the government's case, Salisbury provided crucial inculpatory information on June 20, 1995. McRae testified at the suppression hearing that at the end of the interview in controversy he suspected Salisbury of criminal conduct. This means, of course, that McRae acquired incriminating information straight from Salisbury's lips. In McRae's report of the interview, he wrote, *inter alia:*

> "Salisbury filled out at least one certificate of residency (COR) in addition to the one he recently filled out *in connection with this investigation.*"

(emphasis supplied). This makes clear that the form which Salisbury was asked to fill out and did fill out on March 15, 1995, was actually a part of this investigation, which was already under way as early as March 15, 1995. It sounds like a "set up."

Armed with the facts learned from Salisbury and as set forth in McRae's report, McRae later checked the mortgage records for Salisbury's residential mortgage, clearly admitted by Salisbury, and ascertained that the mortgage was a VA-insured mortgage, indicating that it was a loan on a "permanent residence" as required by the Veterans Administration. Bingo! Fruit of the poisoned tree! Indictment!

### Conclusions of Law

What was actually in the minds of McRae and of Salisbury on June 20, 1995, is, of course, impossible for a third party to know with absolute certainty. What was in McRae's mind is certainly not as important

as what was in Salisbury's mind. The totality of circumstances created a situation in which both Salisbury's Fifth Amendment rights to due process and to protection against self-incrimination were transgressed, whether by design or by accident.

It is very often very difficult to ascertain when an admission against criminal interest is voluntary and when it is not. It is not difficult, however, to recognize an intimidating environment and to know that an investigator overreaches when he misleads his target, promising that he is only seeking information that may add something to the investigation of someone else, when, in actual fact, the person being interviewed is the target. This is the kind of situation which caused public criticism and outcry about the the Federal Bureau of Investigation's misleading interviews of Mr. Jewell while investigating the bombing that occurred in the Olympic Park in Atlanta. When an investigator says one thing and means another, particularly when that fact is overlaid by a law enforcement atmosphere, the potential for abuse of governmental power can become more than potential.

The government's argument here that this was simply an "administrative" or a "civil" investigation leaves this court singularly unimpressed. See William M. Acker, Jr., *"United States v. Handley:* A New Direction in Fifth Amendment Jurisprudence in the Eleventh Circuit, or an Aberration?", 44 Ala. L.Rev. 143 (1992). This court refers to two particularly apposite expressions from two respected courts of appeal. The first comes from *U.S. v. Baldwin,* 60 F.3d 363 (7th Cir. 1995), in which the Seventh Circuit, speaking through Chief Judge Posner, said:

> Whether a particular confession or other statement was "voluntary" or "involuntary" is a classic instance of a "mixed question of fact and law," that is to say, of the application of a legal standard (that of voluntariness) to "the facts" as a layman would understand them, such as what the agent said to Baldwin, whether it was true, and how much Baldwin knew about how the criminal justice system works. This court, consistent with decisions by the Supreme Court, *McDermott Int'l Inc. v. Wil-*

*ander,* 498 U.S. 337, 356, 111 S.Ct. 807, 818, 112 L.Ed.2d 866 (1991); *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 401–05, 110 S.Ct. 2447, 2458–61, 110 L.Ed.2d 359 (1990); *Pierce v. Underwood,* 487 U.S. 552, 559–61, 108 S.Ct. 2541, 2547–48, 101 L.Ed.2d 490 (1988), has moved decisively to the position that appellate review of determinations of mixed questions of fact and law should be governed by the standard of clear error, and not by the de novo standard. E.g., *G.J. Leasing Co. v. Union Electric Co.,* 54 F.3d 379, 381 (7th Cir. 1995); *Stevens v. United States,* 49 F.3d 331, 334 (7th Cir.1995); *Williams v. Commissioner,* 1 F.3d 502, 505 (7th Cir.1993); *United States v. Spears,* 965 F.2d 262, 269–71 (7th Cir.1992); *Mars Steel Corp. v. Continental Bank N.A.,* 880 F.2d 928, 933 (7th Cir.1989) (en banc). The reasons are several. The trial judge, because he is closer to the facts—the court of appeals gets them at second hand—knows more about the premise to which the legal standard (possession, negligence, good faith—or voluntariness, as in the *Stevens* case) is to be applied. He is also more practiced than appellate judges in assessing the significance of facts. And since the legal standard is a given, and only its application to a particular and perhaps unique set of facts is in question, de novo review is not necessary to produce a reasonable uniformity of the legal principles applied within the court's jurisdiction. Uniformity occurs at the level of the standard; it is impossible at the level of application because outcomes vary with the differing facts of different cases.

These considerations apply as forcefully to appellate review of determinations of voluntariness as they do to determinations of other mixed questions of fact and law. To our knowledge, no case or other appropriate source of guidance to judges has suggested a reason to suppose these considerations inapplicable, or even less applicable, to determinations of voluntariness. It is true that the issue of voluntariness is constitutional. But so is the issue of probable cause for a search or arrest, and, even closer, the issue of the voluntariness of a waiver of *Miranda* rights and the issue of

voluntariness of a consent to search; yet all three are issues in which appellate review in this circuit is for clear error, rather than being de novo. *United States v. Spears, supra,* 965 F.2d at 269–71; *Bryan v. Warden,* 820 F.2d 217, 219–20 (7th Cir. 1987); cf. *United States v. Price,* 54 F.3d 342, 345 (7th Cir.1995). · Consistency and common sense require that the issue of the voluntariness of a confession be treated the same way, and we so hold today.

*Id.* at p. 365.

The second persuasive elaboration of the applicable legal principles is found in *U.S. v. Swint,* 15 F.3d 286 (3d Cir.1994), wherein the Third Circuit, speaking through Judge Greenberg, said:

The district court primarily predicated its opinion that Swint's statements were inadmissible on its conclusion that the government had secured them from Swint when he was in custody without giving him the *Miranda* warnings. *See Illinois v. Perkins,* 496 U.S. 292, 296–98, 110 S.Ct. 2394, 2397, 110 L.Ed.2d 243 (1990). However, the court also held that "Swint's statements are ... inadmissible because they were involuntary." *United States v. Swint,* Crim. No. 92–286–02, at 20–21 n. 8 (*see* App. at 204–05). We will affirm the district court's order on the latter ground, as we hold that Swint's statements to the DEA agents on May 2, 1991, were involuntary. Consequently, we do not decide whether the district court erred in holding that Swint's interrogation was custodial and thus that his statements also were inadmissible due to the government's failure to give him *Miranda* warnings.

Our review of the district court's holding that Swint's statements were involuntary is plenary, but we accept its findings of fact unless they are clearly erroneous. *Arizona v. Fulminante,* 499 U.S. 279, 286–87, 111 S.Ct. 1246, 1252, 113 L.Ed.2d 302 (1991) (citing *Miller v. Fenton,* 474 U.S. 104, 110, 106 S.Ct. 445, 449, 88 L.Ed.2d 405 (1985)). *See also Beckwith v. United States,* 425 U.S. 341, 348, 96 S.Ct. 1612, 1617, 48 L.Ed.2d 1 (1976) (appellate court has duty " 'to examine the entire record and make an independent determination of the ultimate issue of voluntariness' ") (quoting *Davis v. North Carolina,* 384 U.S. 737, 741–42, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895 (1966)).

It is clear that "only voluntary confessions may be admitted at the trial of guilt or innocence," *Lego v. Twomey,* 404 U.S. 477, 478, 92 S.Ct. 619, 621, 30 L.Ed.2d 618 (1972), and the government does not challenge the applicability of this principle to the statements involved here. Rather, it contends that the statements were voluntary. The Supreme Court has recognized that noncustodial interrogations may "by virtue of some special circumstances, be characterized as [involuntary]." *Beckwith,* 425 U.S. at 347–48, 96 S.Ct. at 1617. Thus, in this case, even if Swint's interrogation had been noncustodial, the government had the burden of "proving, by a preponderance of the evidence, that [Swint's] ... confession was voluntarily given."

\* \* \* \* \* \*

Thus, the district court's findings of fact, which the record amply supports, indicate that the state and federal authorities used a coercive "bait-and-switch" technique, first by leading Swint and his attorney to believe Swint's statements would not be used against him and then by depriving Swint of that protection without giving him *Miranda* warnings.

Our ·conclusion that Swint's statements were involuntary is consistent with the opinion of the Court of Appeals for the Fifth Circuit in *United States v. Rogers,* 906 F.2d 189 (5th Cir.1990), a case similar to this one. In *Rogers,* representatives of the local sheriff's department told the defendant he would not be charged with criminal conduct if he cooperated with them. Id. at 190. A few days later the defendant received a call from the sheriff's department advising him that somebody wanted to talk to him. Id. Once he arrived at the sheriff's department, the defendant was questioned by a federal agent who began by reading him his *Miranda* rights and getting him to sign a waiver. Although the defendant in *Rogers,* unlike Swint, was given *Miranda* warnings and signed a waiver, the court held that his

confession "was not voluntary for purposes of the Fifth Amendment." This case presents an even more egregious and coercive "bait-and-switch," inasmuch as state and federal authorities questioned Swint on the same day, and did not give him *Miranda* warnings or communicate to him or his attorney that his statements to federal agents were not off-the-record. Thus, *Rogers* provides a compelling precedent for our conclusion that we should affirm the district court's order suppressing Swint's statements to the DEA agents as involuntary.

*Id.* at pp. 288, 289, 291 and 292.

McRae, despite his disclaimer, was, in the context of the subject interview, a law enforcement official. He had the authority and the duty to investigate the possible criminal activity suggested by the anonymous letter. He had a plan. In this case he did his job in a way that overreached and that tainted the evidence he obtained from Salisbury. The situation reached the status of the "unique" that precludes use of the discovered product.

Although an order of suppression has already been orally entered, a separate written order will be entered confirming that order.

### ADDENDUM TO MEMORANDUM OPINION OF MAY 8.1997

In order to make sure that this court's opinion entered on May 8, 1997, is not misunderstood, the court wishes to make perfectly clear that it did not mean to suggest that David A. Salisbury's "boss" was an agent of the government when he ordered Salisbury to report for the interview in controversy. The fact that the order came from an official of Salisbury's employer simply added to the atmosphere in which Salisbury's subsequent revelations to the governmental agent were less than voluntary. It is the perception and the vulnerability of the person being questioned upon which a Fifth Amendment inquiry must focus, even though all of the facts and circumstances contributing to that perception and vulnerability may not have been deliberately created by governmental action.