**PEOPLE OF THE VIRGIN ISLANDS, Plaintiff**
**vs.**
**DANIEL CARLO CASTILLO (D.O.B. 04/06/1977), Defendant**

Criminal No. ST-07-CR-0000129

Superior Court of the Virgin Islands

Division of St. Thomas and St. John

February 5, 2008

198

199

JESSE M. BETHEL, ESQ., Assistant Attorney General, Virgin Islands Department of Justice, St. Thomas, U.S. Virgin Islands, *Attorney for the Plaintiff.*

HAROLD W.L. WILLOCKS, ESQ., Chief Public Defender, Office of the Territorial Public Defender, St. Croix, U.S. Virgin Islands, *Attorney for the Defendant.*

HOLLAR, *Judge*

## MEMORANDUM OPINION

(February 5, 2008)

### I. INTRODUCTION

This matter is before the Court on a Motion to Suppress Defendant's Statements in the Within Matter filed June 22, 2007, and Addendum to Defendant's Motion to Suppress Statements in the Within Matter filed August 24, 2007, with Memoranda in support thereof. Defendant's Motion to Suppress Arrest and Statement Made Subsequent to that Arrest filed on September 26, 2007, and Defendant Daniel Castillo's Memorandum of Points and Authorities in Support of Motion to Suppress Arrests and Statement Made Subsequent to that Arrest, filed on October 22, 2007, are also under consideration. In response, the People have filed memoranda of law in opposition. For reasons articulated below, Defendant's motions are denied in all respects.

200

## II. PROCEDURAL POSTURE

The Defendant's first motion to-suppress the statement and confession made on April 12, 2007, based on an alleged violation of Defendant's Fifth Amendment guarantees, came on for Hearing and Pretrial Conference on August 21, 2007. After hearing arguments by counsel and testimony by witnesses, the Court denied Defendant's motion to suppress; however, Defense Counsel orally requested leave to file a more comprehensive and expanded motion to suppress. The Court granted the motion. On September 14, 2007, this matter came on again for a suppression hearing, based on violation of Defendant's Fourth and Fifth Amendment Rights, regarding custodial interrogation and unlawful arrest on April 8, 2007. The People were advised of their burden to prove that the detention was either a lawful arrest or not an arrest. The People presented additional testimony; however, two officers directly connected with the interrogation of the Defendant on April 8, 2007, were inexplicably unavailable. Defense Counsel argued in support of the motion to suppress on the record as it stood and requested relief. Before ruling, the Court gave the People one last opportunity to bring forth the necessary and material witnesses to substantiate the merits of their opposition to Defendant's second motion to suppress. Opportunity was also given to Defense Counsel to strengthen and re-file their motion. On October 2, 2007, this matter came on for a final suppression hearing, at which time the Court heard a historical background of the case from the People. The Court required the parties to respond to the following probing questions:

1. Was the defendant in custody when he was questioned by law enforcement on April 8, 2007?

2. Whether the defendant voluntarily showed up at the Police Station, Zone A, on April 8, 2007?

3. On April 8, 2007, was defendant ever handcuffed? If so, when, why, and by whom?

4. Was the defendant free to go before he was escorted to Zone A for interrogation on April 8, 2007?

5. Was defendant escorted to Zone A on April 8, 2007 by law enforcement?

6. Who was at Zone A when the defendant was questioned by law enforcement on April 8, 2007?

7. Who conducted the questioning on April 8, 2007?

8. Was the questioning reduced to writing on April 8, 2007?

9. Was defendant "*Mirandized*" during that questioning?

10. Was the questioning on April 8, 2007, videotaped, tape recorded or recorded in any manner. If so, how?

11. Why was the defendant released after questioning on April 8, 2007?

12. Was the defendant "a person of interest" or the target of an investigation when he was questioned at Zone A on April 8, 2007?

13. What did law enforcement already know about the defendant and the victim at the time he was brought in for questioning on April 8, 2007?

14. What information was provided to law enforcement from the time the victim was reported missing until the time the defendant was picked on April 8, 2007? And from whom was that information provided?

15. What was done in terms of the investigation from the time the defendant was released on April 8, 2007, until the time the body was discovered on April 11, 2007?

16. How many times did the police go to the place where the victim's body was ultimately found before they actually discovered it on April 11, 2007?

17. At what point in time did the police discover that the defendant was living in the yard where the body was discovered?

18. Why did Commissioner McCall request the United States Marshal Service to locate and bring the defendant in on April 8, 2007?

19. Why was the United States Marshal Service called upon again to locate the defendant on April 12, 2007?

20. Assuming arguendo that the April 8th, 2007, custodial interrogation was an unlawful arrest, would only the fruits of that arrest to the time the defendant was released that same day be subject to suppression pursuant to the "poisonous tree doctrine"?

21. Under what circumstances would the "poisonous tree doctrine" extend to the subsequent arrest of April 12, 20078 and the attending confession of the defendant?

202

22. Assuming arguendo that the defendant said something incriminating on April 8, 2007, during an unlawful custodial interrogation, would the incriminating statement(s) escape suppression by virtue of the "inevitable discovery doctrine" or the "independent source doctrine" or the "attenuating circumstances doctrine?"

23. What information did Marshal Drake have regarding the Defendant when he arrested the Defendant on April 12, 2007, and how was that information derived?

24. In determining whether suppression is warranted, does the Court only look at what U.S. Marshal Drake knew individually and personally at the time of the arrest on April, 12, 2007, or what law enforcement knew collectively at the time?

25. Who made the arrest on April 12, 2007?

26. Is every arrest where probable cause is found legal?

27. Is the role of a Magistrate at the time of Advice of Rights the same as the role of a Judge at a hearing to suppress evidence?

28. Must every legal arrest be based upon probable cause?

29. Pursuant to *Wong Sun* and *Brown v. Illinois* was there a break in the causal connection between any illegal arrest and any statement made by the defendant?

30. Is suppression based on 4th amendment violations different from suppression based upon 5th amendment violations?

The hearing then proceeded and several witnesses for the People testified. Thereafter, Defense Counsel(s) advised the Court that they would simply place arguments on the record without putting on a formal case. After hearing the arguments, the Court ordered both parties to submit briefs on the issues of attenuation and whether there was a break in the causal connection between the time the Defendant was first apprehended and questioned on April 8, 2007, and the time he was formally arrested on April 12, 2007. The matter was taken under advisement.

### III. FACTUAL SCENARIO

On Friday, April 6, 2007 ("Good Friday"), Beatrice Anita Hennis ["Anita Hennis"] reported that her twelve (12) year old daughter, Laquina Hennis, was missing. Earlier that evening a friend of Anita Hennis was

scheduled to pick up Laquina and her sister Laquanda from their aunt's house at the Oswald Harris Court Housing Community ["Oswald Harris Court"] and drop them home in Estate Bovoni. While Laquanda arrived home, Laquina did not. Concerned that her daughter was not home, Anita Hennis called and awakened her cousin, Detective John Farrington, at 11:30 p.m. that evening, to ask for his help in locating her daughter. Detective Farrington instructed Anita Hennis to go to the closest police station, Zone C, at Four Winds Plaza, to make a report and then to meet him at Laquina's last known location, Oswald Harris Court.

Less than an hour later, at approximately 12:15 a.m. on April 7, 2007, Anita Hennis and Officer Lauren Battiste met Detective Farrington. Before commencing the search, Anita Hennis, Officer Battiste, Detective Farrington, and Detective Farrington's wife considered possible places to search. After discussing the possibility of Laquina having gone down First Avenue, the four split up into two vehicles. Detective Farrington and his wife went in one vehicle while Anita Hennis and Officer Battiste traveled in another. Detective Farrington and his wife searched: First Avenue and adjacent streets, Charlotte Amalie High School, Barbel Plaza, Paul M. Pearson Garden, the parking lot behind the First Bank (Old Cinema One/Word of Faith) location, Wheatley Center, and some areas of Estate Thomas. Officer Farrington took a break, went home at 4 a.m., and then resumed searching at 7:30 a.m. During the break, Officer Farrington obtained a picture of Laquina, created a missing person's flier, xeroxed approximately one hundred (100) copies, and passed them out at Tutu Park Mall, Wheatley Center, and other areas Laquina frequented.

In the course of investigating the whereabouts of Laquina, Detective Farrington learned that on Saturdays she liked to go over to Lockhart School to watch the cheerleaders practice. Acting on this information, Detective Farrington went to Lockhart School around noon where he passed out some of the fliers. While at the school, Detective Farrington was approached by a dark complexioned black male, approximately twenty-five (25) years old, between five feet, seven inches (5'7") and five feet, ten inches tall (5'10"), and weighing between one hundred sixty-eight pounds (168lbs) and one hundred eighty pounds (180lbs). The male conveyed to Farrington that he heard that the last person seen with Laquina was a male he knew as "Chichi." Detective Farrington, not realizing who "Chichi" was at that time, called Anita Hennis to pass the information to her. Anita Hennis stated that Chichi's real name is Daniel

Castillo, and that his ex-girlfriend, with whom he has one child, was her (Anita Hennis) former roommate at Oswald Harris Court. Detective Farrington then remembered that he sometimes encountered Castillo when he dropped Laquina or her sister home, and that Laquina knew Castillo. Detective Farrington also recalled Castillo in his official capacity as a Police Officer because Castillo, who was known as "Danny" or "Daniel" Castillo, had been previously arrested. Officer Farrington passed all of this information to Corporal Dwayne Donovan at the police station before commencing his regular 4:00 p.m. to 12:00 a.m. shift, the afternoon of April 7, 2007.

While on his break, Detective Farrington went over to the Investigation Bureau of the Virgin Islands Police Department ["VIPD"] and spoke with Corporal Corrine Daniel and Detective Michelle Potter, to ascertain if there was any progress on the case. Detective Potter reported that she also had a recent case with Castillo and that his last arrest report listed Number 16, 8th Street, Sugar Estate, St. Thomas, U.S. Virgin Islands, as his residence, but she understood the address to be the location of an abandoned building. At approximately 8:00 p.m. Detective Farrington asked Corporal Daniel and Detective Potter to accompany him to Daniel Castillo's last known address on 8th Street. Once all three arrived at the address on 8th Street, it was confirmed that the property was indeed abandoned. On the property were three (3) structures, to wit: an abandoned two (2) storey concrete house; an abandoned one (1) storey concrete house; and a 12' x 20' shed. There was also an abandoned building on the property to the south of the address. The officers checked two buildings during their search, as well as the yard area. The officers first examined the abandoned building on the southern property, finding it inundated with boxes and debris. They then investigated the front room (living room) of the one storey concrete structure on the property, finding feces all over the walls and floor. The officers announced themselves before entering any of the structures. During the search, Detective Farrington repeatedly called out to Laquina thinking that, if she were there, she would more likely respond to a familiar voice. The search of the area was, however, abbreviated because the light source went dead, so they left without finding anything.

On Easter Sunday, April 8, 2007, after his shift ended, Detective Farrington talked to Police Commissioner James McCall about the situation. Commissioner McCall in turn called Sergeant David Monoson,

assigned to the Forensic Identification Unit of the VIPD. Upon request of Detective Farrington and Commissioner McCall, Sergeant David Monoson created a "wanted for questioning" poster for Daniel Castillo, who was considered "a person of interest" at that time. The April 8th poster contained the Defendant's photograph (collected from his police file), along with handwritten information about the Defendant under his picture. The poster listed the defendant's prior arrests and instructed that he be held for questioning. Sergeant Monoson then distributed some of the fliers to Detective Farrington, who said he would circulate them, Sergeant Roberto Lima of the VIPD, the VIPD zones, and federal law enforcement officials. Commissioner McCall also contacted U.S. Marshal David Drake, a supervisor with the United States Marshals Service, to ask for his assistance in finding Laquina, and designated Sergeant Lima as the point of contact. U.S. Marshal Drake solicited the help of two of his deputies, U.S. Marshals John Simpson and Paul Nielsen. After Marshals Simpson and Nielsen updated Marshal Drake, they all proceeded to 8th Street. At approximately 11:45 p.m., the Marshals arrived at Castillo's last known address.

Marshals Nielsen and Simpson had previously searched the abandoned building on the property to the South of the address and the one storey concrete structure, so they proceeded to check out the remaining structures. Marshal Nielsen checked the yard while Marshals Simpson and Drake walked over to Castillo's residence by stepping over a laid down chain linked fence separating the southern property from Castillo's residence. After observing a wooden shed with the door open they proceeded to the two storey concrete house and found an unlocked door. They went into a kitchen area off to the left where they found a mattress standing upright in the kitchen. After checking behind the mattress the Marshals performed a security sweep of the area to make sure there was no one around. To the right of the kitchen was an area set up as a bedroom, with a night stand against the wall beside a twin sized mattress. In front of the nightstand, between the bed and the door, was a small blue medium sized tub with a lid on it. On top of the tub was a Bible opened to the book of "Exodus" with two partially burned candles on either side. The Marshals checked the rest of the building and did not find anyone inside. They then moved outside to take a closer look at the shed. The door to the shed opened outward and was kept open by the swollen ground with clothes, garbage and papers carpeting the inside.

After concluding the search, Marshal Drake called Sergeant Lima to request a picture of Castillo. They met Sergeant Lima on the street between the District Court of the Virgin Islands and Superior Court of the Virgin Islands for the picture, after which they began searching for Castillo. The Marshals, believing Castillo was of French ancestry, headed over to Frenchtown. In Frenchtown, Marshal Nielsen showed Castillo's picture to the fishermen in the area in front of Frenchtown Deli. The two other Marshals spotted Castillo while leaving their vehicle. The Marshals, who were not in uniform, identified themselves to Castillo. They told Castillo that they were looking for the missing girl and that he had been the last one seen with her on Friday, April 6, 2007, around 2:00 p.m. Castillo denied being with Laquina. The Marshals told Castillo that Sergeant Lima wished to speak with him at the station. Castillo claimed that he was already headed over there but needed two dollars ($2.00) to catch a safari downtown. Marshal Drake told Castillo that they would give him a ride to the station.

Marshal Drake called Sergeant Lima and informed him that they were bringing Castillo to the station and arranged for Castillo's pick-up. Marshal Simpson then patted Castillo down for weapons and after finding none, placed him in handcuffs and put him in the back of the Marshal vehicle. The vehicle had no screen or cage. The two Marshals were in the driver and passenger seats in the front of the vehicle while the remaining Marshal sat next to Castillo, who sat in the rear passenger compartment. On the way to the station Marshal Drake asked Castillo if he knew anything that could help them find Laquina. Castillo replied no. Upon arriving at the Alexander A. Farrelly Justice Center, the U.S. Marshals un-cuffed Castillo and turned him over to the detectives of the VIPD, who escorted him into the Zone A Command.

Upon his arrival to VIPD, Detective Sofia Rachid of the Criminal Investigation Bureau interviewed Castillo. After taking Castillo's general information, such as his name, phone number, and address, Detective Rachid told Castillo that he was there to be questioned about the missing minor, Laquina Hennis. She then informed him that he was the last person seen walking and talking with Laquina. Thereafter interrogation of Castillo took place as follows:

Q: So you know Laquina Hennis?

A: Yes.

Q: When was the last time you saw Laquina?

A: On my birthday April 6th around 2:30 p.m.

Q: Were you walking with Laquina?

A: No.

Q: Were you with Laquina?

A: No.

Q: Did Laquina speak to you?

A: I told her hello, and asked her how she was doing?

Q: Did Laquina tell you where she was going?

A: No.

Q: What did Laquina have on that day that you saw her?

A: She had on a pink dress (fitted long).

Q: In what area did you see Laquina?

A: I saw her between Building 5 and 2 in Oswald Harris Court. She was talking to her sister who was on a bike telling her that she was going to K-Mart to buy a straight. Her little sister told her "you don't have no money to buy a straight." Laquina told her "Don't mind my business." I saw her going towards K-Mart and I sat where I was and a couple of minutes after she came back with a K-Mart bag with straight. She went to Building 5 archway and she went and put the straight on the porch and went about her business.

Q: Did you see where she went after she put the straight on the porch?

A: Yeah, she went walking down by Building 2 side.

Q: Did you see Laquina get into a vehicle?

A: No.

Q: Was she with anyone?

A: I did not see her with nobody. It looked like she was trying to do some stuff before her grandmother came to pick her up.

Q: Have you seen Laquina since April 6th?

A: No, I haven't seen her.

Q: Do you know where she could be?

A: I have no idea.

Q: Do you know if Laquina has a boyfriend?

A: I know she has a friend (a man name Scabby nephew) his name is Aniek that is who she does be around a lot.

208

Q: How long have you known Laquina?

A: I know her from 1997 or 1998 that's when they use to stay with my baby mother. Her mother (Anita) was my baby mother's roommate.

Q: What is your baby mother name?

A: Kamisha Hodge.

Q: Where does Kamisha live?

A: Some place out Bolongo. I don't know the exact location.

Q: How old is Aniek?

A: I don't know he goes to Cancryn.

Q: Has any of the family members ever told you that Laquina run away from home before?

A: No.

Q: What kind of relationship does Laquina have with her mother?

A: A typical mother and daughter thing. They would argue, the mother would make simple things big and she would scream at Laquina. Laquina was getting out of hand with her mother. But, I never saw her mother abuse her, she would just favor the smallest daughter more.

Q: Have you ever seen Laquina's mother beat her?

A: She would beat her to discipline her not to abuse her. But they don't really get beat like that.

Q: Do you know where Laquina does hang out?

A: No.

Q: Do you know any of Laquina's friends?

A: Yes, one girl who makes birthday the same day as me her name is Dinisha, Jalisha and Fefe.

Q: Where does [(sic)] these girls live?

A: Danisha lives Building 6 of Oswald Harris, Jalisha lives Building 5 of Oswald Harris Court, and Fefe lives on Second Street across from a coconut tree. It is not far from where the other two girls live. I don't know the building number.

Q: Do you have anything else to add to this statement?

A: No.

Q: Can you read, write and understand English?

A: Yes.

Throughout the session, Castillo was never advised of his rights. He cooperated throughout the question-and-answer session and was thereafter released. After Detective Rachid took Castillo's statement, he was given Corporal Corrine Daniel's number in case he needed to contact her with further information.

On the morning of Wednesday, April 11, 2007, at approximately 10:00 a.m. Sergeant David Monoson along with Detectives Phillips and Donastorg from the Juvenile Unit went to Castillo's last known address on 8th Street looking for any signs of a struggle and hoping to find Laquina alive. Upon arrival, the officers searched the abandoned building set up as a residence. After failing to find anything of relevance, the officers left the scene. Around 8:00 p.m. that same day, the officers were called back to that same location because of a citizen's report of a foul odor emanating from the property. Upon the officers' return to the location, a body was found in a bin within a shed on the property by Officer Charles Gumbs. The body was later identified as that of Laquina Hennis.

After Laquina's body was discovered, Sergeant Monoson processed the scene and secured the rest of the area until the VIPD could obtain a search warrant. The shed was exactly four (4) feet from the building that the Defendant had set up as his residence. The shed floor was badly littered with garbage and debris approximately one foot deep, forcing forensic officers to literally step on it in order to maneuver around. There was a partition that ran through the middle of the shed but did not go completely to the opposite end. The bin containing the victim's body was on the far side of the shed tipped slightly to the side with a wedding dress resting on top. There was a pink sheet inside the lid of the bin. The badly decomposed body was wrapped in a green sheet, facing down, with the victim's feet visible at the rim of the bin. Both the wedding dress and pink sheet were thrown aside by Officer Gumbs when he discovered the body. Sergeant Monoson meticulously photographed the inside of the shed, collected the wedding dress, sheets, and a uniform custodian type dress. Officers then carefully lifted and transported both the bin and the body intact to the medical examiner's office.

The dwelling where defendant was last known to reside seemed to be occupied only by one person. In that dwelling was a cot sized bed along

with defendant's belongings. The walls of the structure were covered with graffiti reflecting the names of defendant's children and religious writings. There were also notebooks filled with diary writings, in handwriting similar to the graffiti on the walls. Two days after the body was found, the officers obtained a search warrant allowing Sergeant Monoson to collect items belonging to the defendant. The items found included paternity orders, advice of rights orders, and recent pay stubs—all inscribed with the Castillo's name.

On Thursday, April 12, 2007, at approximately 2:00 p.m. following the discovery of Laquina's decomposed body in close proximity to Castillo's last known address, Marshal Drake[1] and his deputies went in search for Daniel Castillo in the Frenchtown area. After searching the area around Frenchtown Deli and the immediate vicinity, the Marshals moved the search to the hill between Villa Olga and the Oceana Restaurant, a hotel and a restaurant respectively within the same vicinity. The Marshals climbed uphill between a break in a wall on a well-beaten, densely wooded, path. The trail split several times and each Marshal took a trail continuing up the hill. The trail Marshal Drake was traversing ended, but he had not reached the top. Wanting to be thorough, Marshal Drake proceeded to search the entire area and continued to climb to the top of the hill where the brush got thicker. At one point the brush got so thick that Marshal Drake was forced to crawl. After crawling to a section that was somewhat leveled off, Marshal Drake saw a blue tarpaulin tied to some small trees and brush forming a "lean-to". Crawling a bit further, a male was observed in a pair of either blue pants or jeans with no shirt, standing on a large rock looking in the general direction where Marshal Drake was located. The male looked just past the point where Marshal Drake had crawled. After recognizing the individual as Daniel Castillo, Marshal Drake was unable to tell from his vantage point whether he could successfully apprehend Castillo without Castillo escaping. With his firearm drawn, Marshal Drake ascended to his feet, called out and identified himself shouting, "U.S. Marshal!" "Freeze!" Castillo immediately threw his hands up in the air and announced that he was unarmed. Marshal Drake approached Castillo and told him to get off the

---

[1] Marshal Drake was dressed in "511" khaki pants with either a Marshal's shirt or some other type of T-shirt.

rock. Castillo got down off the rock and laid face down on the ground while Marshal Drake patted him down for weapons.

Marshal Nielson then arrived at the spot, joining Marshal Drake and Castillo. As Marshal Drake checked Castillo for weapons Castillo unsolicited and spontaneously said, "I killed the little girl Laquina." Marshal Drake then placed Castillo under arrest and advised him of his *Miranda* rights. Castillo replied that he did not have any rights and that he was sorry—that he did not want to be like his father and uncle, but now he was and he did not have any rights. After Marshal Drake handcuffed Castillo he re-holstered his firearm and assured Castillo that he did have rights. He read Castillo his constitutional rights one by one off of his *Miranda* card. Marshal Drake explained to Castillo that he was a Deputy United States Marshal and that he had to advise him of his rights before he could ask him any questions. Specifically, Castillo was advised that: he had the right to remain silent; anything he said can be used against him in a criminal proceeding; he has the right to talk to a lawyer for advice before they ask any questions and to have a lawyer during questioning; if he could not afford a lawyer that one would be appointed to him before questioning begins; if he decided to answer any questions without a lawyer being present he still has the right to stop answering at any time; he has the right to stop answering at any time until he speaks to a lawyer. After each question Marshal Drake asked Castillo if he understood, and Castillo answered affirmatively that he understood each right.

After Marshal Drake finished advising Castillo of his rights and made sure he understood them, Castillo stated that he did not want a lawyer and that he wanted to confess. Marshal Drake instructed Castillo to start from the beginning and to tell him what happened. Castillo said that on Friday, April 6, 2007, his birthday, he walked with Laquina to the house on 8th Street where he was a "squatter". He described the property as having three (3) separate buildings and explained that he lived on the first floor of the structure in the back on the left, next to the shed. While he and Laquina were in the house, he got into an argument with her because he said some derogatory things about her mother. Laquina became angry at Castillo's comments and hit him. Castillo responded by punching her back. Laquina returned the blow, this time hurting his finger. Castillo grabbed Laquina around her throat with both hands and squeezed until she stopped breathing. Then, he put her body in a tub and put the tub in

the shed right before dark. Castillo later retreated to the hill in Frenchtown where he was found. He had slept there for three (3) nights.

After Castillo's confession, Marshal Drake instructed all of the deputies to collect everything that was on the hill and process it for the VIPD. U.S. Marshal James Sullivan arrived on the hill and was informed by Marshal Drake that the Defendant had made some utterances and a subsequent confession to the murder. Marshal Sullivan again asked Castillo if he wanted a lawyer. Castillo replied no, and said that he told Marshal Drake everything. The Marshals collected bedding, the tarpaulin, and all other items that were there and walked down the hill to their respective vehicles. On the way down the hill, Castillo stated that he was hungry and thirsty. The Marshals placed Castillo in their vehicle and took him to the McDonald's "drive-thru" in Frenchtown, where they ordered him food.

While sitting in front of McDonald's, it dawned upon Marshal Drake that they should memorialize what occurred and what the Defendant had confessed for the VIPD. He hand wrote a statement for Castillo to sign. Marshal Drake told Castillo that he wrote a statement as though it was coming from Castillo and that he would rewrite it if Castillo found something wrong or different. Before Castillo signed the statement, Marshal Drake read and simultaneously recorded the statement back to Castillo. The statement read[2]:

> I, Daniel Castillo give a statement after having been advised of my rights not to speak and to be represented by an attorney. I speak to Deputy Marshal David Drake of my own free will without threats.
>
> I want to confess to the killing of the little girl Laquina. I am sorry. She hit me, and I hit her back and then I choked her until she wasn't breathing. I killed her. I'm sorry. I told Mr. Castillo that he did not have to speak to me and he stated, "No, I'm sorry. I want to. I'm sorry I killed her."
>
> I asked where he left her and he stated "I put her in a tub in the shed."
>
> I asked when and he stated "Friday on my birthday," and it's signed by Daniel Castillo dated and the time and also witnessed by Drake and John Simpson.

---

[2] This statement is a combination of a question and answer interview and narrative statement, and the statement appears exactly as written by Marshal Drake and signed by Castillo.

After Marshal Drake took Castillo's statement, Castillo was transported down to the police station and turned over to Sergeant Roberto Lima with the statement, and the food purchased for Castillo.

## IV. ANALYSIS

The issues to be resolved by the Court are: (1) whether the statement made by the Defendant to law enforcement, on April 12, 2007, should be suppressed as a violation of Defendant's Fifth Amendment rights; (2) whether the detention of the Defendant, on April 8, 2007, was unlawful, and thus, a violation of Defendant's Fourth Amendment rights; (3) if the April 8, 2007, arrest was unlawful, whether the subsequent evidence disclosed, *inter alia,* the discovery of the body of Laquina Hennis and confession made by defendant on April 12, 2007, are subject to the exclusionary rule under the "poisonous tree" doctrine.

In resolving these overlapping constitutional challenges, the Court must employ a systematic approach and apply the law to the particular factual scenario.

### A. The Statement Made By Defendant To Law Enforcement On April 12, 2007, Was Not Violative Of His Fifth Amendment Rights And Should Not Be Suppressed.

The inquiry, at the first suppression hearing, focused upon Defendant's confession made on April 12, 2007, immediately preceding the Deputy U.S. Marshal's recitation of the rights afforded him under *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The challenge raised by Defendant was solely based upon his contention that his Fifth Amendment rights were violated. The Court therefore had to determine whether Defendant's statements were induced, elicited or solicited by Marshal Drake or were the statements voluntarily offered by the Defendant.

The Fifth Amendment to the United States Constitution states, in pertinent part, "no person . . . shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law . . ." U.S. CONST. amend. V.[3] Spanning many

---

[3] The Fifth Amendment to the U.S. Constitution is applicable in the Virgin Islands pursuant to § 3 of the Revised Organic Act of 1954, as amended, 48 U.S.C. § 1561. The complete

decades, the United States Supreme Court has grappled with clarifying this aspect of the Fifth Amendment in order to carefully balance a defendant's right not to self-incriminate himself against the Government's right to aggressively, but lawfully, prosecute criminal offenders within their respective jurisdiction. In so balancing, the Supreme Court, in *Miranda,* established a set of rights that a defendant must be informed of when taken into custody by law enforcement authorities. Those rights are as follows:

> ██ [p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned.

*Id.* at 444-445, 86 S. Ct. at 1612. The *Miranda* decision rested on a number of fundamental principles inherent within the American criminal justice system in a further, more deliberate attempt to protect individual rights afforded under the Fifth Amendment. As the Court recognized, preserving citizen integrity and dignity, deterring unlawful law enforcement practices, and pursuing greater respect for the privilege against self-incrimination were the objectives the Court sought to achieve in deciding *Miranda. See generally Miranda*, 384 U.S. at 442-467, 86 S. Ct. at 1611-1624. As Justice Brandeis once expressed in a 1928 dissenting opinion, which the Court reiterated in the *Miranda* decision,

Revised Organic Act of 1954 is found at 48 U.S.C. §§ 1541-1645, reprinted in V.I. CODE ANN., Historical Documents, Organic Acts, and U.S. Constitution at 73-177 (1995 & Supp. 2003) (preceding V.I. CODE ANN. tit. 1).

Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizens. In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means would bring terrible retribution. Against this pernicious doctrine this court should resolutely set its face.

*Olmstead v. United States*, 277 U.S. 438, 485, 48 S. Ct. 564, 575, 72 L. Ed. 944 (1928) (dissenting opinion); *see also*, *Miranda*, 384 U.S. at 479, 86 S. Ct. at 1630-1631.

 Having established the rights a Defendant must be informed of upon being taken into custody, this Court must also resolve whether the confession made by Castillo on April 12, 2007, was voluntarily made. Voluntariness is ascertained by inquiring whether the confession was "the product of an essentially free and unconstrained choice by its maker," whether it was "the product of a rational intellect and a free will," and whether at any time the defendant's will was "overborne." *United States v. Swint*, 15 F.3d 286, 289 (3d Cir. 1994) (quoting *United States ex rel. Hayward v. Johnson*, 508 F.2d 322, 326 (3d Cir. 1975)).[4] Moreover, the Supreme Court has held,

 [w]hile each confession case has turned on its own set of factors justifying the conclusion that police conduct was oppressive, all have contained a substantial element of coercive police conduct. Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law.

*Colorado v. Connelly*, 479 U.S. 157, 163-164, 107 S. Ct. 515, 520, 93 L. Ed. 2d 473 (1986). Furthermore, precedence has shown that ". . . a finding of

---

[4] *United States ex rel. Hayward v. Johnson*, supra, was overturned on procedural grounds. *See Patterson v. Cuyler*, 729 F.2d 925 (3d Cir. 1984).

coercion need not depend upon actual violence by a government agent; a credible threat is sufficient." *Arizona v. Fulminante*, 499 U.S. 279, 287, 111 S. Ct. 1246, 1252, 113 L. Ed. 2d 302 (1991). In other words, "coercion can be mental as well as physical, and . . . the blood of the accused is not the only hallmark of an unconstitutional inquisition." *Id.* at 287, 111 S. Ct. at 1253 (quoting *Blackburn v. Alabama*, 361 U.S. 199, 206, 80 S. Ct. 274, 279, 4 L. Ed. 2d 242 (1960)). As recognized in *Swint,* "courts look to the totality of circumstances to determine whether a confession was voluntary."[5] *Swint,* 15 F.3d at 289.

■ Turning to the facts of this case, the Court is convinced that the statements made by Defendant upon being arrested on April 12, 2007, were spontaneous utterances and not the result of solicitation or coercion by the arresting authorities. The testimony disclosed that Marshal Drake sought and found Defendant in the area of Frenchtown. Upon locating the Defendant, Marshal Drake identified himself and told him to "freeze." While pointing a firearm in the Defendant's direction, Marshal Drake instructed the Defendant to lie face down on the ground in order for the Marshal to pat him down for weapons. Marshal Drake re-holstered his firearm and called out to another Marshal in the area at the time. Simultaneously, the Defendant made a spontaneous and unsolicited confession to the murder of Laquina Hennis as well as making other inculpatory statements. Thereupon, Marshal Drake advised Defendant of his *Miranda* rights. After a careful review of the factual scenario, it is clear that Marshal Drake followed constitutional protocol and in no way coerced, cajoled, or compelled Defendant into confessing. After the Defendant "blurted out" his confession, Marshal Drake advised

---

[5] ■ *Swint* outlined a number of factors that may be utilized in deciding voluntariness: element of police coercion, *see Colorado v. Connelly*, 479 U.S. at 167, 107 S. Ct. at 521; length of the interrogation, *see Ashcraft v. Tennessee*, 322 U.S. 143, 153-154, 64 S. Ct. 921, 925-926, 88 L. Ed. 1192 (1944); location, *see Reck v. Pate*, 367 U.S. 433, 441, 81 S. Ct. 1541, 1546, 6 L. Ed. 2d 948 (1961); continuity, *see Leyra v. Denno*, 347 U.S. 556, 561, 74 S. Ct. 716, 719, 98 L. Ed. 948 (1954); defendant's maturity, *see Haley v. Ohio*, 332 U.S. 596, 599-601, 68 S. Ct. 302, 303-305, 92 L. Ed. 224, (1948) (opinion of Douglas, J.); defendant's education, *see Clewis v. Texas*, 386 U.S. 707, 712, 87 S. Ct. 1338, 1341, 18 L. Ed. 2d 423 (1967); defendant's physical condition, *see Greenwald v. Wisconsin*, 390 U.S. 519, 520-21, 88 S. Ct. 1152, 1153-1154, 20 L. Ed. 2d 77 (1968) (per curiam); defendant's mental health, *see Fikes v. Alabama*, 352 U.S. 191, 196, 77 S. Ct. 281, 284, 1 L. Ed. 2d 246 (1957); and the failure of police to advise the defendant of his *Miranda* rights, *see Haynes v. Washington*, 373 U.S. 503, 516-517, 83 S. Ct. 1336, 1344-45, 10 L. Ed. 2d 513 (1963).

Defendant of his *Miranda* rights, reminding him that he did in fact have rights, which Defendant waived and continued to recite the circumstances leading to Laquina Hennis' death. Thereafter, a written statement was prepared and signed by the Defendant and Marshal Drake. The statement was also witnessed by another Deputy U.S. Marshal. Ergo, Defendant's confession is not suppressible based on a Fifth Amendment violation.

## B. The Detention of The Defendant On April 8, 2007 Was Unlawful And Thus a Violation Of His Fourth Amendment Rights

Following the denial of the Defendant's motion to suppress his confession on April 12, 2007, on Fifth Amendment grounds, the Court granted Counsel for the Defendant an opportunity to expand upon their initial Motion to Suppress, whereupon a Fourth Amendment challenge to the April 8, 2007, detention of Defendant was subsequently raised. If indeed a constitutional violation occurred on April 8, 2007, that transgression could potentially impact upon subsequently discovered evidence, including the events that occurred and statement made on April 12, 2007. In addressing the Defendant's subsequent Fourth Amendment challenge, the Court must resolve whether the detention of the Defendant on April 8, 2007, constituted an unlawful arrest, lacking probable cause, and thus, a violation of his Fourth Amendment rights.

The Fourth Amendment to the United States Constitution provides, in pertinent part, "the right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . ." U.S. CONST. amend. IV.[6] Under Fourth Amendment jurisprudence, an arrest or a seizure is generally unreasonable unless probable cause can be shown. *See Leveto v. Lapina*, 258 F.3d 156, 167 (3d Cir. 2001); *see also, Berg v. County of Allegheny*, 219 F.3d 261, 269 (3d Cir. 2000) ("Fourth Amendment prohibits arrests without probable cause"). "Seizure," within this context, is defined as when a person ". . . is detained by means

---

[6] The Fourth Amendment to the U.S. Constitution is applicable in the Virgin Islands pursuant to § 3 of the Revised Organic Act of 1954, as amended, 48 U.S.C. § 1561. The complete Revised Organic Act of 1954 is found at 48 U.S.C. §§ 1541-1645, reprinted in V.I. CODE ANN., Historical Documents, Organic Acts, and U.S. Constitution at 73-177 (1995 & Supp. 2003) (preceding V.I. CODE ANN. tit. 1).

intentionally applied to terminate his freedom of movement." *Berg*, 219 F.3d at 269.[7]

█ In determining whether an arrest or seizure is supported by probable cause, the central inquiry is upon whether the evidence "'. . . would warrant a man of reasonable caution in the belief' that a felony has been committed." *Wong Sun v. United States*, 371 U.S. 471, 479, 83 S. Ct. 407, 413, 9 L. Ed. 2d 441 (1963). In this respect, a totality of the circumstances approach is utilized wherein the threshold inquiry is ". . . whether the officers could, on the information which impelled them to act, have procured an [arrest] warrant . . ." and the facts of any particular case is outcome determinative. *See id.* at 479, 83 S. Ct. at 413.[8]

The initial seizure of Defendant, on April 8, 2007, by the U.S. Marshals and the transportation of him in handcuffs to Zone "A" Police Station amounted to an arrest, albeit without probable cause. Considering the testimony elicited during the second suppression hearing on October 2, 2007, and the specific circumstances regarding how Defendant Castillo was sought and apprehended for questioning on April 8, 2007, the Court finds that Defendant was in fact unlawfully arrested on <u>April 8, 2007.</u>

Since the Court finds that the Defendant was unlawfully arrested and thus "in custody" at the time he was initially <u>questioned on April 8, 2007,</u> regarding the whereabouts of Laquina Hennis, he was required to be informed on his *Miranda* rights <u>before</u> any interrogation, however no rights or warnings were given to the Defendant. In *Rhode Island v. Innis*,

---

[7] There are several exceptions to the requirement of establishing probable cause for seizures, especially where the period of detention is minimal or the degree of intrusion is limited, of which the Court need not address for purposes of deciding the matter herein. *See Leveto*, 258 F.3d at 163-168; *See generally Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); *see also, Michigan v. Summers*, 452 U.S. 692, 101 S. Ct. 2587, 69 L. Ed. 2d 340 (1981).

[8] The Court in *Wong Sun*, recognizing the inherent evils involved when arrests are carried out in the absence of a warrant and requiring the same requisite proof as though before a judicial officer, held:

The arrest warrant procedure serves to insure that the deliberate, impartial judgment of a judicial officer will be interposed between the citizen and the police, to assess the weight and credibility of the information which the complaining officer adduces as probable cause. To hold that an officer may act in his own, unchecked discretion upon information too vague and from too untested a source to permit a judicial officer to accept it as probable cause for an arrest warrant, would subvert this fundamental policy. *Wong Sun*, 371 U.S. at 481, 471 S. Ct. at 414.

446 U.S. 291, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980), the U.S. Supreme Court announced the point at which a defendant must be apprised of his rights by holding,

> [w]e conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

*Id.* at 299-302, 100 S. Ct. at 1689-1690. In *Reinert v. Larkins*, 379 F.3d 76 (3d Cir. 2004), the Court of Appeals for the Third Circuit ruled that:

> [o]rdinarily, in determining whether an individual is in custody, the ultimate inquiry is "whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." When the individual has not been openly arrested when the statements are made, "'something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates they would not have heeded a request to depart or to allow the suspect to do so.'" (*internal citations omitted*).

*Larkins*, 379 F.3d at 86.

The testimony substantiates that Defendant was undeniably under custodial interrogation upon arriving at Zone "A" Command of the VIPD

because he was transported (in handcuffs) to the Police Station, handed over to VIPD authorities, and escorted inside the building. At no time could it be reasonably construed that the Defendant was free to leave until the conclusion of the questioning by Detective Sofia Rachid. Thus, the Defendant was unlawfully detained and subject to impermissible custodial interrogation. The manner in which the Defendant was questioned at length regarding the whereabouts of Laquina Hennis inescapably confirms that Defendant was not just a "person of interest" but was indeed the prime, if not the only, suspect, regarding the inexplicable disappearance of Laquina Hennis. Moreover, the nature of the questions and the fact that they were transcribed, yet taken in the absence of any *Miranda* warnings, suggest that the VIPD officers were on a "fishing" expedition, attempting to secure concrete evidence of the Defendant's involvement. The methodology utilized by law enforcement in this instance was constitutionally unacceptable. The Defendant was constitutionally entitled to be apprised of his rights and to make a well-informed decision whether to waive those rights, rather than be subject unilaterally to the intrusive inquiry conducted by the VIPD. This was not done. Accordingly, the detention of the Defendant on April 8, 2007, was violative of the Fourth Amendment and the custodial interrogation of the Defendant, at the time he was "a person of interest", without having been given his *Miranda* rights was violative of his Fifth Amendment rights.

**C. Although the April 8, 2007 Arrest and Statements Derived Were Unlawful, The Subsequent Evidence Disclosed and the Confession Made By Defendant, On April 12, 2007, Are Not Subject to the Exclusionary Rule Under the Poisonous Tree Doctrine.**

■■■ The final step in this analysis addresses the admissibility of the evidence obtained after the unlawful arrest and the interrogation session on April 8, 2007. Generally, all evidence obtained as a result of a Fourth and Fifth Amendment violation is subject to exclusion from use at a trial. This principle has been invoked since the early underpinnings of Fifth Amendment jurisprudence. *See generally Bram v. United States*, 168 U.S. 532, 18 S. Ct. 183, 42 L. Ed. 568 (1897); *see also*, *Blackburn v. Alabama*, 361 U.S. 199, 80 S. Ct. 274, 4 L. Ed. 2d 242 (1960) (applying the exclusionary rule to Fourteenth Amendment due process violations). In discussing the policies underlying the "judicially imposed" sanction of

exclusion, the Supreme Court, in *Michigan v. Tucker*, 417 U.S. 433, 94 S. Ct. 2357, 41 L. Ed. 2d 182 (1974)[9], compared and contrasted the rule as applied under the Fourth and Fifth Amendments. *Id.* at 445, 94 S. Ct. at 2364. Referencing the Fourth Amendment, the *Tucker* Court held, ". . . in a search-and-seizure context . . . the exclusionary rule's 'prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures.'" *Tucker*, 417 U.S. at 446, 94 S. Ct. at 2364 (quoting *United States v. Calandra*, 414 U.S. 338, 347, 94 S. Ct. 613, 619, 38 L. Ed. 2d 561 (1974). Elaborating, the Court opined that, "'[t]he rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.'" *Id.* (quoting *Elkins v. United States*, 364 U.S. 206, 217, 80 S. Ct. 1437, 1444, 4 L. Ed. 2d 1669 (1960). The *Tucker* Court applied this same rationale to Fifth Amendment analysis by holding,

> The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence <u>gained as a result of such conduct,</u> the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused. Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force.

*Tucker*, 417 U.S. at 447, 94 S. Ct. at 2365. (Emphasis Added).

 The exclusionary rule was further extended by the Supreme Court in *Wong Sun,* from which the now-famous "Poisonous Tree Doctrine" was derived. That doctrine holds that all evidence derived, either directly or indirectly, from an unlawful invasion into one's realm of constitutional sanctity, must be excluded as proof against the victim. *See Wong Sun,*

---

[9] In *Tucker,* the Court admitted the contradictory statements of a third-party witness who was identified as an alibi, while the Defendant was under custodial interrogation without having been advised that he would be appointed counsel if he was unable to retain one. *Tucker*, 417 U.S. at 435-438, 94 S. Ct. at 2360. However, the interrogation preceded the Court's decision in *Miranda,* thus occurring without the same level of warnings. Nonetheless, the exclusionary rule framework remains controlling authority. *Id.*

371 U.S. at 484-488, 83 S. Ct. at 416-417. Briefly, in *Wong Sun,* law enforcement authorities unlawfully entered several dwelling structures, wherein the alleged assailants made certain incriminating statements at the time of entry. *Id.* at 474-479, 83 S. Ct. at 410-412. Thereafter, the same individuals were each interrogated separately, resulting in several additional statements, later transcribed to paper. *Id.* At trial, several of these statements were admitted over timely objections. *Id.* On appeal, the Court of Appeals for the Ninth Circuit, held, *inter alia,* that the introduced statements were not 'fruits' of any unlawful arrest, and therefore, were rightfully admitted at trial. *Id.* at 478. On *certiorari,* the Supreme Court set forth the standard to be applied in the fruit of the "poisonous tree analysis", by holding:

> ▆ [w]e need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

*Wong Sun,* 371 U.S. at 487-488, 83 S. Ct. at 417.

In the case *sub judice,* on April 8, 2007, when Defendant Castillo was handcuffed, placed in the back of the U.S. Marshals' vehicle, and transported with three Marshals to VIPD headquarters, this amounted to an unlawful arrest. The unlawful arrest in this circumstance is deemed the poisonous tree for purposes of the *Wong Sun* analysis. The fruits borne from this unlawful arrest would be the resulting interrogation and any other subsequently discovered evidence flowing therefrom, all of which would be accordingly suppressed. However, before suppressing any evidence, the Court must next determine whether any exceptions to the exclusionary rule and the "poisonous tree" doctrine exist, which would permit admission of otherwise suppressible evidence.

## 1. Break in the Causal Connection, Sufficient Attenuation Exception.

▆ Notwithstanding the exclusionary rule's broad sweep against admissibility, evidence that is sufficiently <u>attenuated</u> from the unlawful activity (i.e., poisonous tree) to break any causal connection can result in

223

the admissibility of otherwise suppressible evidence. *See generally Brown v. Illinois*, 422 U.S. 590, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975). In *Brown*, although the Court held inadmissible statements made by the defendant after an illegal arrest, pursuant to the Fourth Amendment, *id.* at 603, 95 S. Ct. 2261, the Court nevertheless expounded upon the difference between the Fourth and Fifth Amendment, particularly in the applicability of the exclusionary rule. Although, both amendments are intimately related, *Brown* recognized that they still remain separate constitutional safeguards and with respect to the treatment of evidence, stated,

> The exclusionary rule . . . when utilized to effectuate the Fourth Amendment, serves interests and policies that are distinct from those it serves under the Fifth. It is directed at all unlawful searches and seizures, and not merely those that happen to produce incriminating material or testimony as fruits. In short, exclusion of a confession made without *Miranda* warnings might be regarded as necessary to effectuate the Fifth Amendment, but it would not be sufficient fully to protect the Fourth. *Miranda* warnings, and the exclusion of a confession made without them, do not alone sufficiently deter a Fourth Amendment violation.

*Brown*, 422 U.S. at 601, 95 S. Ct. at 2260-2261. The *Brown* Court went further to explain the rationale of these contrasting yet overlapping policies, by stating:

> If *Miranda* warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted. Arrests made without warrant or without probable cause, for questioning or "investigation," would be encouraged by the knowledge that evidence derived therefrom could well be made admissible at trial by the simple expendent of giving *Miranda* warnings. Any incentive to avoid Fourth Amendment violations would be eviscerated by making the warnings, in effect, a

"cure-all," and the constitutional guarantee against unlawful searches and seizures could be said to be reduced to a "form of words."[10]

*Brown,* 422 U.S. at 602, 95 S. Ct. at 2261 *see also, Kaupp v. Texas,* 538 U.S. 626, 633, 123 S. Ct. 1843, 1847, 155 L. Ed. 2d 814 (2003) (reiterating the holding in *Brown* that the giving of *Miranda* warnings are not a *per se* cure to attenuate the initial illegality and the resulting confession.).

In determining whether an illegal arrest of Defendant on April 8, 2007, was unduly exploited, resulting in the April 12, 2007, confession and/or the discovery of other evidence (i.e., recovery of the body), the Court must take into account several factors pursuant to *Brown,* such as whether *Miranda* warnings were given, the "temporal proximity of the arrest and confession," the "presence of intervening circumstances," the "purpose and flagrancy of the official misconduct," and the "voluntariness of the statement." *Id.* at 603, 95 S. Ct. 2261-2262. *See also, United States v. Butts,* 704 F.2d 701, 704-705 (3d Cir. 1983) (utilizing the *Brown* factors in determining whether a confession was tainted as a result of an illegal arrest.). (Emphasis Added).

██ Applying the foregoing to the case *sub judice,* the statements made to law enforcement by the Defendant on April 8, 2007, first reflected that he was unaware of Laquina Hennis' whereabouts and lacked any substantive information on the reasons for her disappearance. Second, the Defendant's statements did not give police any further information that they did not already have and did not give them any further tips on how or in.what direction to proceed in their investigation. In other words, after speaking with the Defendant on April 8th, the police were no higher in their investigatory ladder, but remained in the same neutral position. Hence, suppression of the interrogation would be of no moment, because the answers provided by the Defendant provided no "fruits" directly or

---

[10] *See also, Murray,* 487 U.S. at 536-537, 108 S. Ct. at 2533, which held:

> The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search, and of testimony concerning knowledge acquired during an unlawful search. Beyond that, the exclusionary rule also prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes "so attenuated as to dissipate the taint."

(internal citations omitted). (*Emphasis Added*).

225

indirectly and did not lead law enforcement on any new path in investigating the child's disappearance. Thus, taking the totality of the circumstances into consideration, the Court is convinced that the lawful discovery of the body, the subsequent lawful arrest of the Defendant, and his spontaneous confession on April 12, 2007, were sufficiently attenuated to destroy any possible causal connection from the unlawful events that occurred on April 8, 2007. *A fortiori* the resulting evidence should not be suppressed.

### 2. Independent Source Exception

 Separate and apart from, yet in conjunction with the "attenuation" exception, the "independent source" doctrine is also applicable in the case *sub judice*. There are two ways the "independent source" doctrine applies. One is more general in scope than the other.

> The more general sense identifies *all* evidence acquired in a fashion untainted by the illegal evidence-gathering activity. Thus, where an unlawful entry has given investigators knowledge of facts x and y, but z has been learned by other means, fact z can be said to be admissible because derived from an "independent source."

*Murray*, 487 U.S. at 538, 108 S. Ct. at 2533; *see also, Segura v. United States*, 468 U.S. 796, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984). Alternatively, the specific use, ". . . was originally applied in the exclusionary rule context . . . with reference to that particular category of evidence acquired by an untainted search *which is identical to the evidence unlawfully acquired*—that is, . . . to knowledge of facts x and y derived from an independent source . . ." *Murray*, 487 U.S. at 538, 108 S. Ct. at 2534. *Murray* held that, under the "independent source" doctrine, the balance between constitutional good and evil must swing in favor of admissibility, because

> [t]he interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse,* position that they would have been in if no police error or misconduct had occurred. . . . When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.

*Murray*, 487 U.S. at 537, 108 S. Ct. at 2533 (quoting *Nix v. Williams*, 467 U.S. 431, 443, 104 S. Ct. 2501, 2509, 81 L. Ed. 2d 377 (1984)).

██ In the case under consideration, the facts disclose that the VIPD received an anonymous call regarding a strong odor emanating from an abandoned structure on 8th Street. When the officers arrived, they immediately recognized the area as Defendant's last known home address, and upon further investigation, found the source of the odor. The source of the odor was the decomposing dead body of Laquina Hennis. The caller's tip was independent from any other source derived throughout the investigation, leading police to discover the body, which then led to Defendant's arrest on April 12, 2007. Moreover, as previously noted, the information disclosed by Defendant during the April 8th interrogation added no additional information to law enforcement than they already possessed, since the VIPD had already known Defendant's last known address from his prior arrest, that the last person seen with the victim was the Defendant, and that the Defendant knew the victim through an acquaintance of the victim's mother. For all these reasons, the evidence, to wit: discovery of the body and all evidence derived therefrom resulted from independent sources, and thus, not subject to exclusion or suppression.

### 3. Inevitable Discovery Exception

██ Akin to the "independent source" exception is the "inevitable discovery" exception. In *United States v. Vasquez De Reyes*, 149 F.3d 192 (3d Cir. 1998), the Court of Appeals for the Third Circuit held that, "it is the government's burden to show that the evidence at issue would have been acquired through lawful means, a burden that can be met if the government establishes that the police, following routine procedures, would inevitably have uncovered the evidence." *Id.* at 195. (Emphasis Added). Moreover, in assessing whether the burden is met, the Court quoted a standard from the Court of Appeals for the Sixth Circuit, which held that,

> ██ proof of inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment and does not require a departure from the usual burden of proof at suppression hearings. The exception requires the . . . court to determine, viewing affairs as they existed at the instant before

the unlawful search, what would have happened had the unlawful search never occurred.

*Id.* at 195 (quoting *United States v. Kennedy*, 61 F.3d 494, 498 (6th Cir. 1995)).

█ From the circumstances presented, the Court finds beyond cavil that law enforcement would have inevitably discovered and did in fact independently discover Laquina Hennis' body. Although the officers had searched the 8th Street structure(s) several times, a citizen's report on April 11, 2007, complaining of a stench emanating from the shed adjacent to the dwelling occupied by the Defendant, led to the officers' return and subsequent recovery of the body. It was therefore only a matter of time before the victim's body would have been inevitably, but independently found, particularly given that the investigation of the missing child involved multiple agencies from territorial and federal levels.

## V. CONCLUSION

The record before the Court discloses that: (1) Defendant, spontaneously and without police solicitation or coercion, made incriminating statements upon his arrest on April 12, 2007; (2) Defendant was unlawfully arrested and subject to custodial interrogation without being given his *Miranda* warnings on April 8, 2007; (3) despite the violation of Defendant's Fourth and Fifth Amendment rights, the subsequent discovery of the victim's body and the spontaneous confession on April 12, 2007, were not fruits borne from the unlawful activities, which would warrant exclusion under *Wong Sun* because a break in the causal connection creating sufficient attenuation from the poisonous fruit was substantiated. Additionally, the discovery of the body was a result of an "independent source" and "inevitable discovery." Accordingly, constitutional challenges to the evidentiary admissions are defeated and the Defendant's motion(s) to suppress are denied.